BOWMAN TRANSPORTATION, INC. *v.* ARKANSAS-BEST FREIGHT SYSTEM, INC., ET AL.

No. 73–1055.   Argued November 20, 1974—
Decided December 23, 1974*

---

*Together with No. 73–1069, *Johnson Motor Lines, Inc.* v. *Arkansas-Best Freight System, Inc., et al.;* No. 73–1070, *Red Ball Motor Freight, Inc.* v. *Arkansas-Best Freight System, Inc., et al.;* No. 73–1071, *Lorch-Westway Corp. et al.* v. *Arkansas-Best Freight System, Inc., et al.;* and No. 73–1072, *United States et al.* v. *Arkansas-Best Freight System, Inc., et al.,* also on appeal to the same court.

Douglas, J., delivered the opinion for a unanimous Court.

*Charles S. Rhyne* argued the cause for appellants in Nos. 73–1055, 73–1069, 73–1070, and 73–1071. With him on the briefs were *Bryce Rea, Jr., Donald E. Cross, Courts Oulahan, Robert L. Jones, Jr., Maurice F. Bishop, Sander W. Shapiro,* and *Jerry C. Prestridge. William L. Patton* argued the cause for the United States et al. in No. 73–1072. With him on the brief were *Solicitor General Bork, Assistant Attorney General Kauper, Carl D. Lawson,*

*Fritz R. Kahn, Betty Jo Christian,* and *Richard H. Streeter.*

*Phineas Stevens* argued the cause for appellees in all cases. With him on the brief were *Drew L. Carraway, Phillip Robinson, M. Ward Bailey, Don A. Smith, Thomas Harper, Wentworth E. Griffin, Frank W. Taylor, Jr., William O. Turney,* and *J. William Cain, Jr.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a direct appeal from a final judgment of a three-judge District Court, 28 U. S. C. §§ 1253, 2101, invalidating an order of the Interstate Commerce Commission. Ten applications of motor carriers to conduct general commodities operations between points in the Southwest and Southeast were consolidated in one proceeding. Three additional applicants were allowed to intervene. The hearing examiners, after extensive hearings, rejected each application. The Commission granted three of the applications of appellant carriers. Appellees, competing carriers, brought an action in the District Court, 28 U. S. C. § 1336, to suspend, enjoin, and annul that portion of the order of the Commission that authorizes issuance of certificates of public convenience and necessity to Red Ball, Bowman, and Johnson. The District Court refused to enforce the Commission's order because its findings and conclusions were arbitrary, capricious, and without rational basis within the meaning of the Administrative Procedure Act, 5 U. S. C. § 706, and likewise refused to remand the case believing that no useful purpose would be served, 364 F. Supp. 1239, 1264.[1]

---

[1] The hearings lasted over 18 months; this transcript covers 23,423 pages; there are 1,989 exhibits; a total of 950 witnesses testified on behalf of 10 applicants; 66 rail and motor carriers entered appearances in opposition to the applications; 48 of the protestants offered evidence through 62 witnesses and numerous exhibits.

The Administrative Procedure Act in 5 U. S. C. § 706 provides that:

"The reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law [or] . . .

.        .        .        .        .

"(E) unsupported by substantial evidence . . . ."

These two provisions of 5 U. S. C. § 706 (2) are part of six which are "separate standards." See *Citizens to Preserve Overton Park* v. *Volpe,* 401 U. S. 402, 413 (1971). The District Court properly concluded that, though an agency's finding may be supported by substantial evidence, based on the definition in *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474 (1951),[2] it may nonetheless reflect arbitrary and capricious action. There seems, however, to be agreement that the findings and conclusions of the Commission are supported by substantial evidence. The question remains whether, as the District Court held, the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as provided in 5 U. S. C. § 706 (2)(A). We disagree with the District Court and accordingly reverse its judgment and remand the cases for consideration of one issue not reached by the District Court or by this Court.

I

The Motor Carrier provisions of the Interstate Commerce Act, 49 Stat. 551, 49 U. S. C. § 307, empower the

---

[2] "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." 340 U. S., at 488. And see 4 K. Davis, Administrative Law Treatise § 29.03, p. 129 (1958); L. Jaffe, Judicial Control of Administrative Action 601 (1965).

Commission to grant an application for a certificate if it finds (1) that the applicant is "fit, willing, and able properly to perform the service proposed"; and (2) that the service proposed "is or will be required by the present or future public convenience and necessity." The Commission made both findings, relying upon the applicants' general service record in support of a finding of fitness, and upon expressions of customer dissatisfaction with the existing service in support of its conclusion that the service proposed was consistent with the public convenience and necessity. The competing appellee carriers made presentations designed to show that their existing service was satisfactory and that the applicants would not offer measurably superior performance. The District Court concluded that the Commission had acted arbitrarily in its treatment of the presentations made by the protesting carriers. While the Commission had acknowledged the appellees' evidence, its reasons for refusing to credit it would not, in the District Court's view, withstand scrutiny, making its action tantamount to an arbitrary refusal to consider matters in the record.

Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park* v. *Volpe, supra,* at 416. The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines* v. *United States,* 371 U. S. 156, 168 (1962). While we may not supply a reasoned basis for the agency's action that the

agency itself has not given, *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co.* v. *FPC*, 324 U. S. 581, 595 (1945). Having summarized the appropriate scope of review, we proceed to consider the District Court's objections seriatim.

## A. Evidence as to Existing Service

The applicant carriers presented exhibits showing the time in transit of selected shipments that had been consigned to appellee carriers by particular shippers during a designated study period. As the Commission acknowledged, the selection of particular shipments from those occurring during the study period had been made with an eye toward demonstrating service inadequacies.[3] These "worst case" studies figured in the Commission's finding that service would be improved by the entry of new carriers to the routes at issue.

The appellee carriers offered studies of their own. These covered the same period and the same shippers as the applicants' presentations, but whereas the applicants had selected particular shipments to emphasize inadequacies, the appellee carriers included in their presentations all of the shipments consigned during the study period. These exhibits, argued the protesting carriers, placed the incidents cited by the applicants in perspective and demonstrated that the existing service was generally acceptable. The Commission acknowledged the appellees' presentations but concluded that they offered an inadequate rebuttal to the applicants' exhibits because

---

[3] The Commission stated: "Many of the service exhibits do not cover all of the shipper's pertinent traffic during the study period and some include shipments which were listed because complaints were received on this traffic." *Herrin Transportation Co.*, 114 M. C. C. 571, 596 (1971).

(1) they "relate to short periods of time or cover traffic handled for specified shippers"; and (2) the studies represented service provided by appellees after the Commission had designated the applications for hearing. *Herrin Transportation Co.*, 114 M. C. C. 571, 599 (1971). The District Court ruled that the Commission had applied inconsistent standards in reviewing the evidence of the parties, since the appellees' exhibits were based upon the same study periods and the same shippers as the applicants' exhibits. 364 F. Supp., at 1259–1260.

We agree with the District Court that the first reason assigned by the Commission—that the appellees' exhibits were based only upon short periods and particular shippers—failed to distinguish the presentations of applicants and opponents. To counter the applicants' presentations, the protesting carriers chose the identical study periods and shippers but expanded the presentation to show all the shipments consigned. Since the protesters confined themselves to the periods and shippers the applicants had selected, there was no basis for an inference that the former had chosen so as to make the exhibits unrepresentative in their favor.

The Commission's second reason, however—that the appellees' studies covered periods subsequent to a notice of hearing—provides support for the Commission's assessment of the evidence. The Commission recognized that protesting carriers might have been spurred to improve their service by the threat of competition raised by the designation of applicants for hearing. Therefore, reasoned the Commission, the protesting carriers' performance subsequent to the notice of hearing might be superior to the service they normally offered, and their exhibits, covering those periods, had to be read in light of that possibility. But the Commission was not precluded from relying upon the demonstrated shortcomings of the protesters' service during that period, for the incen-

tive effect the Commission identified would have, if anything, distorted the performance studies in the protesters' favor.

The issue before the Commission was not whether the appellees' service met some absolute standard of performance but whether the "public convenience and necessity" would be served by the entry of new carriers into the markets served by appellees. *United States* v. *Dixie Express,* 389 U. S. 409, 411–412 (1967). Even if the Commission had accepted appellees' exhibits at face value, it could still have concluded that the deficiencies were sufficient to justify the admission of additional carriers. Certainly the Commission was entitled to regard the appellees' studies as possibly nonrepresentative of the usual service afforded,[4] to reason that the shortcomings

---

[4] The District Court also ruled that since there had been no suggestion during the evidentiary hearings that performance studies subsequent to notice of hearing might not be viewed as representative, the appellees had been denied fair notice of the standards by which their evidence would be judged. 364 F. Supp. 1239, 1260. We disagree. A party is entitled, of course, to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it. Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation. *Ohio Bell Telephone Co.* v. *Public Utilities Comm'n,* 301 U. S. 292 (1937); *United States* v. *Abilene & S. R. Co.,* 265 U. S. 274 (1924). But these salutary principles do not preclude a factfinder from observing strengths and weaknesses in the evidence that no party identified. If the examiners had raised the qualifications to appellees' evidence the Commission later interposed, there would have been no basis for suggesting unfairness. See *American Trucking Assns.* v. *Frisco Transportation Co.,* 358 U. S. 133, 144 (1958). The situation is not altered by the fact that the Commission parted company with the examiners. Even as to matters such as the credibility of witnesses, where the examiner is thought to have an advantage, the reviewing agency is not rigidly barred from taking a contrary position. *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474 (1951). We perceive no reason for binding an agency to the experience and viewpoint of

were probably greater than these studies showed, and to conclude that service would be improved by granting the applications.

## B. Evidence of Applicants' Fitness

The applicants supported their service proposals with exhibits showing transit times over comparable distances on other routes. The appellees once again pointed out that the applicants had been selective and offered transit times on different routes served by the applicants that were substantially longer than those applicants proposed to provide on the routes at issue. Appellees thus argued that the applicants could not reasonably be expected to live up to their service proposals. In addition, the appellees cited service restrictions that the applicants practiced on other routes—refusal to make scheduled pickup of merchandise, refusal to handle shipments less than a certain weight, refusal to transport goods to certain destinations, and the like.

The Commission attributed little significance to the appellees' rebuttal. With respect to transit times, the Commission noted that different highway conditions might make transit times over identical distances totally incomparable. 114 M. C. C., at 611. The District Court held that the Commission had acted arbitrarily in so treating the evidence, for it had apparently relied on the applicants' transit-time evidence (*id.*, at 586, 600) to support its finding of fitness. 364 F. Supp., at 1260–1261. Similarly, the District Court viewed as

---

the examiner in the interpretation of studies in the record. Appellees are not in a position to claim unfair surprise. The Commission offered the identical rationale in interpreting transit-time studies in a case decided just as hearings in this case began. See *Braswell Freight Lines,* 100 M. C. C. 482, 493–494 (1966). Appellees offered their studies knowing that the Commission might interpose qualifications.

arbitrary the Commission's failure to mention in its opinion the service restrictions by applicants that appellees' had cited, since the Commission had relied upon identical restrictions practiced by appellees to support its finding that existing service was not satisfactory. 114 M. C. C., at 600.

The Commission's treatment of the evidence of the applicants' performance on other routes is not a paragon of clarity. Had the Commission responded in a more considered manner to the evidence appellees presented, review would have been greatly facilitated, and further review by this Court perhaps avoided entirely. But we can discern in the Commission's opinion a rational basis for its treatment of the evidence, and the "arbitrary and capricious" test does not require more. The question before the Commission was whether service on the routes at issue would be enhanced by permitting new entry, and as to this the performance by prospective entrants on new routes was of limited relevance. The Commission noted with respect to transit times that different highway conditions might make experience there a poor indication of the times applicants could provide on the routes they sought to enter. More generally, the applicants' performance on other routes might, because of market conditions peculiar to that route (e. g., the nature of demand for service, or the number of competing carriers), offer an inaccurate basis for predicting what the applicants would do if admitted to the routes they sought in competition with the carriers already there. A carrier performing lethargically on a route where it was the sole provider of motor transportation, for example, could ill afford to continue the same practice where the situation was more competitive.[5]

---

[5] We thus distinguish the case where a firm already in possession of a franchise that offers a high degree of protection from competi-

The particular features of the applicants' performance elsewhere that the appellees cited were not shown by the Commission to be explainable by special market conditions on the routes where they occurred. It is said that the Commission could conclude that the evidence of performance elsewhere would be unlikely to prove dispositive, and that accordingly, absent some compelling demonstration by a proponent of a "performance elsewhere" study that it offered important predictive value, the Commission should disregard such evidence.[6] Of course, evidence of especially egregious performance elsewhere might have been viewed as an exception; a general assumption that competition would force new entrants to exceed the pre-existing quality of service in an effort to attract business might have to yield in the face of an applicant whose shortcomings elsewhere were many and flagrant. But no such evidence was offered here, and none of the applicants was so characterized. Indeed the examiners found

tion seeks its renewal. Cf. *Office of Communication of United Church of Christ* v. *FCC*, 123 U. S. App. D. C. 328, 341, 359 F. 2d 994, 1007 (1966) ("history of programming misconduct . . . would preclude . . . the required finding that renewal of the license would serve the public interest").

[6] Fairness as well as rationality, however, command evenhanded application of such a rule. The Commission should not have cited applicants' "performance elsewhere" presentations without noting appropriate qualifications. Compare 114 M. C. C., at 586, with *id.*, at 611. Yet in view of the examiners' undisputed conclusion that all the carriers were "substantial and responsible," there was adequate remaining basis for the Commission's finding of the applicants' fitness. And the service benefits the Commission anticipated from new entry included, not merely a possibility of improved transit times, but many other improvements in service quality. The Commission identified as service deficiencies that would be removed by new entry the following: "restrictions or embargoes [or] outright refusals by existing carriers to handle . . . traffic"; "pickup and delivery problems; interline difficulties relating to loss, damage, tracing, shortages, and misrouting . . . ." *Id.*, at 600.

that "in the main the carriers participating in these proceedings are substantial and responsible carriers" (2 App. 878), and no party has disputed this finding. We do not find the Commission's treatment of the evidence arbitrary.

## II

Having found that the admission of the applicant carriers to the routes they sought would produce benefits to the consumers served, the Commission proceeded to consider the effect of new entry upon the appellees. While the Commission acknowledged that competition from new entrants might cause at least short-run business losses for existing carriers, it found that, with the exception of one carrier, none would be "seriously adversely affected." Further, the Commission concluded that in any event, "the gains to be derived by the shipping public in general far outweigh any adverse effect this carrier or any other protestant may experience." 114 M. C. C., at 611.

The District Court thought the Commission's treatment unsupportable, in view of the findings by the hearing examiners as to adverse impacts if the applications were granted. 364 F. Supp., at 1262–1263. Insofar as the District Court's comments express the view that the Commission failed to consider the examiners' findings or the appellees' interests, the record shows otherwise. The Commission stated in its opinion that "grants of authority will subject some of protestants' traffic to the possibility of diversion," but went on to make findings that there would be no "serious adverse impact." 114 M. C. C., at 610–611.

The evidence that moved the examiners to a contrary view consisted of testimony by appellees' witnesses about the volume of shipments for which new entrants would compete if allowed to enter the market. The testimony thus presented the carriers' maximum potential exposure,

leaving considerable leeway for predicting what was likely if applications were granted. Cf. *Market Street R. Co.* v. *Railroad Comm'n,* 324 U. S. 548 (1945). The examiners emphasized the magnitude of potential harm; the Commission took a more optimistic view. We see nothing arbitrary in this posture. That a carrier's entire business will be subject to competition hardly compels the conclusion that its operations will show no profit. It was rational for the Commission so to conclude that the new entrant may be expected not to swallow up existing carriers, especially if the latter make efforts to attract business. Moreover, the testimony offered by appellees' witnesses gave the carriers' exposure to competition if every new application sought by appellees were granted.[7] Thus, the examiners were reporting upon potential diversions of traffic under conditions that were never realized. Since the Commission granted only three of the 10 pending applications, much of the testimony on this matter had to be regarded with qualification, and some of it disregarded entirely.[8]

The Commission's conclusion that consumer benefits outweighed any adverse impact upon the existing carriers reflects the kind of judgment that is entrusted to it, a power to weigh the competing interests and arrive at a balance that is deemed "the public convenience and necessity." *United States* v. *Pierce Auto Lines,* 327 U. S. 515, 535–536 (1946). If the Commission has "drawn out and

---

[7] Each carrier presented the possible diversion of traffic that would result if the applications it was opposing were granted. In many cases, the protesting carrier was opposing applications not ultimately granted by the Commission. See, *e. g.,* Examiners' Decision, App. D, at 6, 13, 14, 19, 24, 25, 34, 35, and 48 (reproduced in 2 App. 864, 1191).

[8] The same must be said of the examiners' concern that service to small communities might be adversely affected by granting all the applications, since these fears derived from those about impact upon protesting carriers.

crystallized these competing interests [and] attempted to judge them with as much delicacy as the prospective nature of the inquiry permits," *ICC* v. *J–T Transport Co.*, 368 U. S. 81, 89 (1961), we can require no more. Here the Commission identified the competing interests. We cannot say that the balance it struck was arbitrary or contrary to law.

### III

The District Court expressed concern about the considerable lapse of time between the conclusion of evidentiary hearings and the Commission's decision. 364 F. Supp., at 1261–1262. While it is unclear whether this was an independent ground for setting aside the Commission's order, we deem it advisable to deal directly with the suggestion that the record has grown too stale to support the order.

Hearings on the applications in these cases began in 1966 and concluded in 1967. Thereafter, the parties prepared extensive briefs for the examiners, who rendered their decision in November 1969. The decision of the Commission was handed down on December 30, 1971. Thus, the evidentiary material pertained to service conditions which were dated by five years at the time the Commission rendered its decision.

We appreciate the difficulties that arise when the lapse between hearing and ultimate decision is so long. Undoubtedly economic changes dated the 1966 studies that the parties, both applicants and appellees, had placed in the record. Nevertheless, we have always been loath to require that factfinding begin anew merely because of delay in proceedings of such magnitude and complexity. To repeat what was said in *ICC* v. *Jersey City*, 322 U. S. 503, 514–515 (1944):

"Administrative consideration of evidence—particularly where the evidence is taken by an examiner,

his report submitted to the parties, and a hearing held on their exceptions to it—always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening. It has been almost a rule of necessity that rehearings were not matters of right, but were pleas to discretion. And likewise it has been considered that the discretion to be invoked was that of the body making the order, and not that of a reviewing body."

Only in *Atchison, T. & S. F. R. Co.* v. *United States,* 284 U. S. 248 (1932), did we remand a case for reopening of evidentiary proceedings; there the Commission's refusal to reopen in light of the economic metamorphosis brought on by the Great Depression led the Court to find an abuse of discretion. The same exceptional circumstances that compelled that disposition, however, have been found lacking in more recent cases. See *United States* v. *Northern Pacific R. Co.,* 288 U. S. 490 (1933); *Illinois Commerce Comm'n* v. *United States,* 292 U. S. 474 (1934); *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38 (1936); *ICC* v. *Jersey City, supra; United States* v. *Pierce Auto Lines, supra; Northern Lines Merger Cases,* 396 U. S. 491 (1970). *Illinois Commerce Comm'n* v. *United States, supra,* is of particular relevance, for there the Court refused to compel the Interstate Com-

merce Commission to reopen for the inclusion of new economic studies a record already closed for a comparable period. We believe appellees failed to meet the heavy burden thrust upon them by our cases.[9]

The protracted character of the proceedings resulted, not from bureaucratic inertia, but from the number and complexity of the issues and from the agency procedures that extended to the parties, in an effort to insure fairness in appearance as well as reality, and an opportunity to comment upon the proceedings at every stage. More than 900 witnesses testified in the original hearings, which consumed 150 days. At the conclusion the parties submitted briefs requiring seven months to prepare. The examiners' decision did not issue until nearly two years later. It is doubtful that the Commission could have made the record more current by judicial notice alone; while live testimony might not have been required, the Commission would at least have had to entertain evidence in affidavit form. Yet there would have been little assurance that at the conclusion of such a reopening, and the time required to digest the new material, the record would not again have become "stale." Accordingly, we conclude that there is sound basis for adhering to our practice of declining to require reopening of the record, except in the most extraordinary circumstances.

---

[9] Much is made, for example, of the Commission's failure to notice a number of terminal closings by appellant Red Ball that had occurred since evidentiary proceedings had concluded. 364 F. Supp., at 1261. The Commission, however, cited the number of Red Ball terminals—reduced by intervening events—only in support of its conclusion that Red Ball, rather than three other carriers, should be certificated to offer new service. 114 M. C. C., at 603. Since these three carriers are not among appellees, we have doubt that appellees can show substantial prejudice from the Commission's failure to update the information.

## IV

We conclude by addressing a concern voiced by the District Court, that the Commission's decision

"indicates a predilection to grant these particular applications, followed by a strained attempt to marshal findings to support such conclusion." 364 F. Supp., at 1264.

We disagree with the District Court insofar as its remarks charge the Commission with prejudging the issue and deciding without giving consideration to the evidence. But we think the approach adopted by the Commission does differ from that taken by the examiners in significant respects that are important to identify.

The examiners viewed the evidence against a backdrop of assumptions about the relationship between consumer needs and carrier responsibilities. The examiners ruled, for example, that all shippers were not entitled to "single-line service" and that the shippers' difficulties were attributable, in part, to lack of diligence. The examiners put it that

"[n]ormally existing carriers should have an opportunity . . . to transport all of the traffic they can handle adequately and efficiently in the territory they are authorized to serve without the competition of new operations."

And to the extent that service inadequacies were demonstrated, the examiners viewed complaints to force compliance with certificates held by existing carriers as a preferred mode of relief.

The Commission's approach, on the other hand, was more congenial to new entry and the resulting competition. This is the Commission's prerogative in carrying out its mandate to insure "safe, adequate, economical, and efficient service," National Transportation Policy,

preceding 49 U. S. C. § 1. The Commission was not compelled to adopt the same approach as the examiners. It could conclude that the benefits of competitive service to consumers might outweigh the discomforts existing certificated carriers could feel as a result of new entry.[10] Our decisions have dispelled any notion that the Commission's primary obligation is the protection of firms holding existing certificates. *ICC* v. *J-T Transport Co., supra,* disapproved the proposition that shippers must take their grievances through complaint procedures before improvement through new entry is permitted. 368 U. S., at 91. And in *United States* v. *Dixie Express,* 389 U. S. 409 (1967), we rejected the suggestion by a reviewing court that existing carriers have "a property right" to an opportunity to make amends before new certificates issue. *Id.,* at 411.

A policy in favor of competition embodied in the laws has application in a variety of economic affairs. Even where Congress has chosen Government regulation as the primary device for protecting the public interest, a policy of facilitating competitive market structure and performance is entitled to consideration. *McLean Trucking Co.* v. *United States,* 321 U. S. 67 (1944); *FMC* v. *Svenska Amerika Linien,* 390 U. S. 238 (1968); *Gulf States Utilities Co.* v. *FPC,* 411 U. S. 747 (1973); *Denver & R. G. W. R. Co.* v. *United States,* 387 U. S. 485 (1967). The Commission, of course, is entitled to conclude that preservation of a competitive structure in a given case is overridden by other interests, *United States* v. *Drum,* 368

---

[10] In commenting upon the perceived lack of diligence by the shippers in seeking out service, the examiners rejected the notion that "the burden is upon carriers to inform shippers of their services through personal solicitation." The Commission, however, would have been free to conclude that greater promotional effort by carriers, brought about through competition, might most economically facilitate the matching of services to needs.

U. S. 370, 374–375 (1962), but where, as here, the Commission concludes that competition "aids in the attainment of the objectives of the national transportation policy," *McLean Trucking Co.* v. *United States, supra,* at 85–86, we have no basis for disturbing the Commission's accommodation.

## V

Our opinion disposes of appellees' objections to the Commission's order insofar as it granted the applications of Johnson and Red Ball.[11] As to appellant Bowman, however, an issue remains. In granting Bowman a certificate the Commission noted that the authority sought by Bowman exceeded that set forth in Bowman's application. The "excess" was granted, subject to a condition precedent of publication in the Federal Register of Bowman's request for the excess authority. Various appellees filed objections to the augmented authority sought by Bowman, which the Commission overruled. Appellees challenged the Commission's procedure in the District Court on a variety of grounds, and though the District Court indicated disapproval of the Commission's action, the court did not have to rule on the merits of appellees' objections since it set aside the Commission's approval of all the applications.

While we have on occasion decided residual issues in the interest of an expeditious conclusion of protracted litigation, see *Consolo* v. *FMC,* 383 U. S. 607, 621 (1966), we believe that the issue of conformity of the Bowman certificate to its application is one for the District Court. The issue was not briefed or argued here, owing to the limitations set forth in our order noting probable jurisdiction. And while the District Court spoke of the Commission's

---

[11] At oral argument counsel for appellees disposed of any "substantial evidence" objections to the Commission's order by conceding that "we did not allege that any finding of fact itself was not supported by substantial evidence." Tr. of Oral Arg. 25.

action in this regard, we do not construe its expressions as a final ruling, since they were unnecessary to the District Court's disposition of the case. Accordingly, the issue remains open on remand.

We hasten to add, however, that our remand provides no basis for depriving Bowman of authority conferred by the Commission that was within its original application.

*Reversed and remanded.*