567 F.2d 91
 185 U.S.App.D.C. 224
 Clifford L. ALEXANDER, Secretary of the Army, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Global Van Lines, Inc., A. Arnold and Son Transfer & Storage
Co., Movers Round Table, Intervenors.
O.K. TRANSFER AND STORAGE CO. (SHAWNEE, OKLAHOMA), Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Global Van Lines, Inc., et al., Intervenors.
SHERWOOD VAN LINES, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Global Van Lines, Inc., et al., Intervenors.
 Nos. 75-1722, 75-1726 and 75-2164.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 23, 1977.
Decided June 29, 1977.
 
 Judith S. Feigin, Atty., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., were on the brief, for petitioner in No. 75-1722.
 Thomas R. Kingsley, Washington, D. C., for petitioner in No. 75-1726 and intervenor Movers Round Table in No. 75-1722.
 Robert J. Gallagher, Washington, D. C., for petitioner in No. 75-2164 and intervenor A. Arnold & Son Transfer and Storage Co., Inc. in No. 75-1722. Paul F. Sullivan, Washington, D. C., entered an appearance for intervenor A. Arnold & Son Transfer and Storage Co., Inc. in No. 75-1722.
 Raymond Michael Ripple, Atty., I. C. C., Washington, D. C., with whom Arthur J. Cerra, Gen. Counsel, I. C. C., Washington, D. C., was on the brief, for respondent I. C. C.
 John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., entered an appearance for respondent United States in No. 75-1726. Edward E. Lawson and Robert B. Nicholson, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents in No. 75-2164.
 Stanley I. Goldman, Washington, D. C., with whom Alan F. Wohlstetter, Washington, D. C., was on the brief, for intervenors Global Van Lines, Inc., et al.
 Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.
 Opinion for the Court filed by Chief Judge BAZELON.
 BAZELON, Chief Judge:
 
 
 1
 The Interstate Commerce Commission denied gateway elimination applications by three irregular route motor common carriers of household goods. The applicants and the Secretary of the Army have filed petitions for review. The sole issue we must reach is whether the Commission should have considered evidence of military traffic in passing on these applications.[1] We hold that the Commission's refusal to do so was arbitrary, and direct the Commission to reconsider petitioners' applications giving full weight to military traffic.
 
 Background
 
 2
 For years, the Commission has acquiesced in a practice known as "tacking." A carrier with authority from "A" to "B" and from "B" to "C" was permitted to transport goods from "A" to "C" so long as the traffic was transported through "B", the gateway. The need to honor the gateway could be eliminated either by obtaining fresh authority from "A" to "C"[2] or by, as explained below, satisfying the Childress gateway elimination criteria.[3] A carrier unable to remove its gateway under Childress was permitted to continue to tack its authority by transporting goods through the gateway.
 
 
 3
 In the early 1970's, the Commission determined that the circuity inherent in tacking was inefficient and wasteful of gasoline. Consequently, the Commission by regulation prospectively prohibited tacking on movements of longer than 300 miles. Ex Parte MC-55, 119 M.C.C. 530 (1974). As relevant here, when the circuity of such a tacked route is over 20%, the carrier must cease transporting goods through the gateway if unable to obtain fresh authority or to satisfy Childress. In other words, a carrier no longer may tack its authorities "A" to "B" and from "B" to "C" in order to provide service from "A" to "C" through "B". Service from "A" to "C" must be direct, and can under Childress be provided if the carrier:
 
 
 4
 1) actually is transporting a substantial amount of traffic through the gateway, and in so operating, is effectively and efficiently competing with existing direct service carriers; and
 
 
 5
 2) elimination of the gateway would not enable the applicant to institute a new service or service so different from that presently provided as to materially improve the applicant's competitive position to the detriment of existing carriers.
 
 
 6
 In determining the "substantiality" of traffic moved through the gateway, only the two-year period prior to November 23, 1973 is considered. 49 C.F.R. § 1065.1.
 
 
 7
 O.K. Transfer, A. Arnold and Sons, and Sherwood Van Lines, Inc., are irregular route carriers that sought elimination of gateways as required by Ex Parte MC-55. They sought to do so by satisfying Childress. In a consolidated order dated February 25, 1975, the Commission denied the applications of O.K. and Arnold. It found that neither applicant had transported enough non-military traffic through their gateways to satisfy the substantiality requirement of Childress ; military traffic was given only "the most minimal weight" because the Commission concluded that such traffic was dispensed on a rotational basis and hence was not "competitive." Thus, the Commission reasoned, O.K. and Arnold were not "effectively competing with existing competitors." The Department of Defense (DOD), which had not previously participated in this proceeding,[4] sought leave to intervene and sought, along with O.K. and Arnold, rehearing and reconsideration of the February 25 order. In support of its claim that it dispenses its traffic through a competitive process, DOD filed an affidavit by Herbert Paige, Senior Traffic Management Specialist, Military Traffic Management Command. By order of May 27, 1975, the Commission granted DOD's motion to intervene, but denied the motions for reconsideration. The Commission reaffirmed its holding that military traffic is non-competitive, spelling out its reasoning with greater specificity. The Secretary of the Army, on behalf of DOD, O.K. and Arnold all seek review of this order.[5] The application for gateway elimination filed by Sherwood Van Lines was denied on June 30, 1975. Again, the Commission refused to consider Sherwood's military traffic. Reconsideration was denied October 8, 1975 and Sherwood petitioned for review. The petitions of the three carriers and the Secretary have been consolidated on appeal.
 
 
 8
 The Competitive Nature of DOD's System of Traffic Distribution
 
 
 9
 When transporting the household goods of private shippers, the Interstate Commerce Act provides that no common carrier shall charge a different rate than that provided for by the applicable tariff. 49 U.S.C. § 317(b). However, the Act also provides that the United States may obtain reduced rates. 49 U.S.C. § 22. Cf. 49 U.S.C. § 5b(6). Consequently, as its regulations reflect, DOD seeks to obtain the lowest possible rates consistent with efficient service. "The means of transportation selected shall be that which will meet DOD requirements satisfactorily at the lowest overall cost from origin to the final known destination." 32 C.F.R. § 178.3(c).
 
 
 10
 The Commission first held that military traffic was non-competitive and hence incompetent in gateway elimination proceedings in 1960. Von Der Ahe Lines, Inc., 83 M.C.C. 821 (not printed in full, reconsideration subsequently denied). The Commission found that DOD traffic was distributed on an automatic rotational basis and that, in effect, carriers merely were passive recipients of the traffic tendered to them. DOD was not a party in Von Der Ahe. Since then, the Commission has more or less consistently refused to give weight to military traffic in gateway elimination proceedings, relying largely on Von Der Ahe.[6] DOD participated unsuccessfully in several of these cases.
 
 
 11
 In seeking reconsideration in Arnold and O.K. Transfer, DOD filed an affidavit prepared by its Senior Traffic Management Specialist, Mr. Paige, detailing the method by which DOD now allocates its traffic. Mr. Paige testified that the system found in Von Der Ahe to be non-competitive was no longer employed by DOD. Under the current system, carriers must be on the Traffic Distribution Roster (roster) to be eligible to receive shipments. According to Mr. Paige, a carrier must meet rigorous standards concerning its facilities and service to be placed on the roster. Army Appendix 104-05.[7] Traffic is then distributed to carriers with the lowest rates on file available to perform the service in a timely fashion. Id. at 105; DOD reg. 4500.34R. If no carriers with the lowest rates are available, traffic is then distributed to carriers with the next lowest filings. Traffic is not, however, rotated automatically among those on the roster. A serviceman may veto the carrier next in rotation or, affirmatively, select any carrier on the applicable roster. Army App. at 105; DOD reg. 4500.34R, P 6002(c)(2). Furthermore, during the summer months when most traffic is carried, the rotational system is often discarded. Army App. at 105-06. Carriers awarded little or no traffic during periods of roster suspension are not awarded proportionately larger shares during other periods. Id. Finally, volume moves are typically awarded on the basis of individualized bidding. Id.; DOD reg. 4500.34R P 6013.
 
 
 12
 Although nothing in the record contradicts Mr. Paige's testimony, the intervenors, several major national carriers, suggest it is not complete. In order to establish the various rosters, they point out, DOD has two two-part filing cycles a year. First, each carrier submits its bid for particular routes. Then, during the so-called "Me-Too" period, other carriers may indicate whether they are willing to provide service at the lowest rate filed during the initial period. Those carriers willing to do so comprise the roster from which DOD makes its initial selections. Intervenors submit a "Me-Too" system cannot be competitive.
 
 
 13
 In concluding that DOD's system of traffic distribution is not competitive, the Commission stressed that during the pertinent time period DOD employed "no real rating of the carrier's rendered service."[8] and that "all carriers placed on allotment rosters are now tendered shipments," J.A. at 626. However, we find no rational connection between these observations and the conclusion drawn by the Commission. Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-6, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The Commission neither articulated its definition of "competition" nor explained why private non-military traffic is competitive. More importantly, the record demonstrates that the DOD system creates incentives for individual carriers to provide higher quality and lower cost service than other carriers in order to acquire a larger share of its traffic. Consequently, DOD traffic must be considered "competitive."
 
 
 14
 First of all, by emphasizing that all carriers on the rosters receive shipments, the Commission was indicating that it regarded those carriers as passive recipients of traffic.[9] However, it is misleading to focus, as the Commission did, on the method by which traffic is distributed to those on the roster without also considering how the roster is made up. As noted above, the roster is comprised of only those carriers willing to do business at the lowest price filed. Under this system, each carrier has an incentive to underbid other carriers in order to increase its market share. In other words, the roster is created by price competition. And this system does not lose its competitive nature because of its "Me-Too" aspect. Indeed, the "Me-Too" system enables DOD to obtain the lowest possible rates in the aggregate. Without "Me-Too," DOD would have to pay higher rates for all shipments that the lowest filer could not handle. Furthermore, if the Commission were affirmed in disregarding military traffic, the likely result would be anti-competitive: with fewer carriers bidding for each route, the rates charged by those remaining might be higher. Finally, the competitiveness of DOD's system is heightened by the fact that the roster is discarded during summer when the majority of shipments are transported[10] as well as for bulk movements.
 
 
 15
 Second, even if rates were uniform and not set by the carriers, carriers could still compete by offering better service. The Commission obviously had this point in mind when it relied on DOD's failure to employ a formal rating system. However, even though there is no formal rating system, the record clearly demonstrates that the DOD system encourages service competition. A shipper may veto the next carrier on the roster or, affirmatively, request any particular carrier that happens to be on the roster. Carriers thus have a strong incentive to provide superior, on-time service.
 
 Conclusion
 
 16
 For the reasons expressed above, we find that the Commission erred in concluding that military traffic is not competitive and need not be considered in gateway elimination proceedings. Consequently, we grant the petitions for review and direct the Commission to reconsider petitioners' applications giving full weight to military traffic.
 
 
 17
 It is so ordered.
 
 
 
 [1]
 The carriers raise several other issues that need not be reached. We merely note in passing that some of these issues are meritless on their face. For instance, the claim that elimination of tacking privileges constitutes a revocation of operating authority in violation of due process is foreclosed by Thompson Van Lines v. United States, 399 F.Supp. 1131 (D.D.C.1975), aff'd 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976)
 
 
 [2]
 49 U.S.C. § 307(a) (1970). See Pan American Bus Lines, 1 M.C.C. 190 (1936). The Secretary of the Army asserts, and the Commission does not deny, that it is far more difficult and expensive to obtain fresh authority than to have a gateway removed under Childress, see note 3, infra
 
 
 [3]
 Childress-Elimination Sanford Gateway, 61 M.C.C. 421 (1952)
 
 
 [4]
 DOD's belated entry into the proceedings is not indicative of disinterest or neglect. In Ex Parte MC-55, the Commission had stated that "evidence of supporting shippers need not be presented" in gateway elimination proceedings. 119 M.C.C. at 549. Furthermore, DOD is the largest shipper of household goods in the United States, doing business with virtually every carrier in the country. Consequently, its resources would be badly strained if it intervened in every gateway elimination proceeding that affected its interests
 
 
 [5]
 The Commission asserts that the Secretary of the Army lacks standing to pursue this appeal because the military was not injured by the Commission's orders. Since the carriers raise the same issue as the Secretary, we need not decide this question. We note, however, that determining whether the military has been injured requires a decision on the merits: if the DOD does distribute its traffic competitively it would be injured by a reduction in the number of competitors
 
 
 [6]
 Petitioners assert, and the Commission disputes, that the Commission had not consistently regarded military traffic as non-competitive and hence cannot find support in its prior decisions for its conclusion in this case. Since, however, DOD has recently changed its method of distribution, the Commission's prior decisions whether consistent or not are not dispositive here. The question here is whether the current system is competitive
 
 
 [7]
 The Commission in its June 5 Order, on the other hand, characterized these qualifications as minor and stated they did not support a finding of competitiveness. J.A. at 625
 
 
 [8]
 DOD adopted a new distribution system, known as "CERS", effective May 1, 1974, which entailed evaluating carrier performance. The Commission in its June 5 Order indicated that this system might be considered competitive. However, the only shipments considered in gateway elimination proceedings are those that occurred in the two years preceding Nov. 23, 1973
 
 
 [9]
 "In essence, the Commission found no real change in the nearly automatic system by which DOD has been allotting its traffic. There is essentially no competition among carriers except for waiting their turn to handle a shipment." Commission brief at 25 (emphasis added)
 
 
 [10]
 During the years relevant for gateway elimination proceedings, "though instructions were forwarded to maintain the TDR wherever possible, the difficulty of this task was recognized by permitting the ITO's to request exceptions to this TDR maintenance when the capability diminished and it resulted in poor service to the installation." Paige affidavit, Army App. at 106