MISSISSIPPI PUBLIC SERVICE COMMISSION, City of Raymond, Town of Utica, International Paper Company, Masonite Corporation and M. S. Stuckey, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.

No. 81–4070.

United States Court of Appeals, Fifth Circuit.

Unit A

June 25, 1981.

**552**

Gordon P. MacDougall, Washington, D.C., Bennett E. Smith, Asst. Atty. Gen., Miss. Public Service Com'n, Jackson, Miss., for petitioners.

Thomas F. McFarland, Jr., Chicago, Ill., for Intern. Paper Co. & Masonite. Richard M. Kamowski, Chicago, Ill., for intervenor Ill. Cent. Gulf R.R. Co.

Daniel B. Harrell, I.C.C., John J. Powers, III, James H. Laskey, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before CHARLES CLARK, TATE and WILLIAMS, Circuit Judges.

TATE, Circuit Judge:

Petitioners ask on appeal that we review an order of the Interstate Commerce Commission (ICC), by which it affirmed (with modifications) a decision of an Administrative Law Judge allowing abandonment by the Illinois Central Gulf Co. (ICG) of a segment of (railroad) branch line between McRaven and Hermanville, Mississippi.[1] Because we find the ICC's decision to be supported by substantial evidence, we affirm.

---

**1.** We pretermit discussion of the applicability of the Staggers Rail Act of 1980, P.L.No. 96–448 (October 14, 1980)—(concerning whether the ALJ's decision was administratively final)—since the ICC heard the protestants' appeal and rendered an order in the proceeding.

**2.** Furthermore, the protestants contended that the operating results of 1979 were not representative due to the extraordinary rainfall during the year which reduced the harvesting and movement of plywood. However, the ALJ (and by adoption the ICC) found that the shippers

---

*Decision of the Administrative Law Judge*

ICG filed an application on December 18, 1979, seeking a certificate of public convenience and necessity allowing the abandonment of its branch line between McRaven and Hermanville, Mississippi (approximately 44.5 miles). At the hearing before ALJ Joyner, ICG attempted to establish that: (1) it would need to spend nearly $605,000 to rehabilitate the track and replace a bridge on this segment; (2) it incurred significant opportunity costs, see notes 3 and 7, *infra*; and (3) for the last three years this particular branch had been operating at a loss (1977—$71,166; 1978—$74,617; 1979—$85,121).

The major protestants of the abandonment were two companies that utilized the branch for shipping their respective products—the Masonite Corporation (a manufacturer of wood products) and the International Paper Company (pulpwood). Masonite contended that ICG furnished it an insufficient number of cars (which aided in ICG's operating loss), and that loss of rail service would result in an additional yearly expenditure of $143,000 for shipping. The International Paper Company (IP) made substantially the same contention—insufficient cars were supplied and that its increased freight charges would amount to $177,008 per year.[2]

After balancing the competing interests of the parties and communities involved, *State of Colorado v. United States*, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926), the ALJ stated that the "continued operation of the line merely to benefit the protestants would be an unnecessary burden upon interstate commerce." He found

---

"failed to demonstrate a strong correlation between the rainfall and the decreased timber business. There is no reason to conclude that the declining business was not a reflection of economic conditions that should be expected to continue." (ALJ Decision, p. 9)

The ALJ also noted that the lack of railroad cars was not significant since it was not proved that ICG failed to "supply cars in order artificially to create low traffic levels to support abandonment." (ALJ Decision, p. 10)

that (1) the shippers had alternative means of transportation, (2) rehabilitation costs would total approximately $450,000, (3) ICG would incur opportunity costs of $208,351, and (4) ICG was operating this branch line at a yearly loss.

*ICC Decision*

IP, Masonite, and the Mississippi Public Service Commission, inter alia, appealed the decision of the ALJ to the Interstate Commerce Commission. The ICC, with some modifications,[3] adopted the ALJ's findings and affirmed its decision to allow ICG to abandon its branch line between McRaven and Hermanville.

*The Present Appeal*

On appeal, the petitioners contend the ICC erred in:

1. Finding that future operating losses would burden ICG—since the ICC failed to take into consideration that the potential existed for future increased traffic on the line.

2. Finding that track rehabilitation costs would burden ICG. .

3. Finding that the shippers' use of alternate modes of transportation is feasible.

4. Failing to make a finding relating to the effect of the abandonment on rural and community development.

5. Finding that opportunity costs should be computed by using 9.3 percent rather than 2.4 percent (rate of return applied to net liquidation value).[4]

*Discussion*

The decision reached by the ICC must be affirmed if it is supported by sub-

stantial evidence and it is not arbitrary, capricious, or an abuse of discretion. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), reh. den., 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975). As we recently stated in *State of Texas v. United States*, 642 F.2d 87, 90 (5th Cir. 1981), "The Commission's role in abandonment proceedings is to balance the immediate and local interests of the community and the shippers against the broader public interest in freeing interstate commerce from undue burdens." It is not our duty to reweigh that evidence already presented to the ICC. *State of Texas v. United States, supra,* 642 F.2d at 90.

After examining the record before us, we are unable to conclude that the decision of ICC was neither supported by substantial evidence nor was arbitrary, capricious, or an abuse of discretion. It is true that for each issue established by ICG there was conflicting evidence presented by the protestants. However, it would be improper for us to conduct a full reappraisal of the evidence first presented to the ALJ and then to the ICC. *State of Texas v. United States, supra; C. A. White Trucking Co. v. United States*, 555 F.2d 1260, 1264 (5th Cir. 1977).

There was sufficient evidence presented to establish that this line was unprofitable in the past, and would continue to be unprofitable in the future. The ICC's failure to consider "potential traffic" in the future cannot be considered arbitrary in light of the insufficient evidence produc-

---

**3.** The ICC found that the ALJ, in computing the opportunity cost, incorrectly used 11% rather than 9.3% (cost-of-capital for the nation's railroads). See Ex Parte No. 381, Adequacy of Railroad Revenue (1980 Determination), 364 ICC 311 (1980).

The ALJ also found that he could not consider potential traffic on line because there were no "off-branch costs" presented. The ICC found that the ALJ "inadvertently referred to off-branch costs when he meant on-branch costs." Nevertheless, he was "correct in concluding that the revenues from the 'potential' traffic could not be considered because they

[did] not reflect all the costs associated with the additional movement." (ICC p. 4).

**4.** The protestants also contend that the ICC failed to have conditioned the granting of the abandonment on the requirement that ICG would continue to retain the preabandonment rail distances in computing rates for pulpwood traffic, to which ICG had originally agreed.

The ICC refused to apply this condition, finding that artificial rates for an indefinite duration do not serve the public interest. (ICC p. 5) We are unable to state that this constituted an abuse of discretion.

ed by the petitioners to establish (as nearly as possible) an accurate prediction of future net revenues.[5] Additionally, there was suf-

**5.** Masonite attempted to establish that it would soon double the capacity of its Hermanville lumber mill, thus resulting in increased traffic for ICG, contributing an estimated $59,951 in net income to ICG. Both the ALJ and the ICC found that this " 'potential' traffic could not be considered because [the revenues] do not reflect all of the costs associated with the additional movement." (ICC p. 4)

On appeal, the petitioners urge that ICC erred in failing to take this potential traffic into consideration. In light of the fact that the potential revenues did not include additional on-branch costs resulting from this added traffic, we find the ICC did not abuse its discretion.

**6.** Indeed, the ICC even found that the ALJ underestimated track rehabilitation expenditures.

**7.** The ICC in Ex Parte No. 274, *Abandonment of Railroad Lines—Use of Opportunity Costs, 360 ICC 571* (1979), determined that it was appropriate to use opportunity costs as *one* factor in approving rail abandonments. The ICC therein defined "opportunity cost" to be "the real economic loss an entity experiences when it must forego some other, more profitable use of its resources." See discussion of opportunity costs in *Missouri Pacific Railroad Company v. United States*, 625 F.2d 178 (8th Cir.), reh. denied, 625 F.2d 184 (8th Cir. 1980).

With respect to opportunity costs for this particular branch line here under consideration, the ICC stated:

In determining the ICG's opportunity cost the (Administrative Law) Judge multiplied an 11 *percent* rate of return against a net liquidation value of $1,883,992. (The net liquidation value is not contested). The 11 percent figure was derived from Ex Parte No. 363, *Adequacy of Railroad Revenue (1979 Determination)*, 362 I.C.C. 343 (1980). Appellants suggest the proper rate of return is 2 percent. We believe, as explained in our recent *Rock House* [Texas and Pacific Railway Company Abandonment, 363 ICC 666 (1980)] and *Kevil* [Illinois Central Gulf Co.—Abandonment, 363 ICC 729 (1980)] cases, that the proper figure is 9.3 percent.

This 9.3 percent figure is derived from the adjustment of our annual finding of the cost-of-capital for the nations' railroads. Instead of the 1979 determination used by the Judge, we used the 1980 determination and found that the weighted cost-of-capital was 12.1 percent, not 11 percent. We then adjusted this figure to reflect the fact that our abandonment analysis is a pretax cost of capital figure, 19.0 percent, is then adjusted downward to reflect the impact of inflation. The result is a finding that the real pretax cost-of-capital is 9.3 percent.

ficient evidence presented to establish that track rehabilitation costs[6] and opportunity costs would not be insignificant.[7]

Using the 9.3 percent rate of return, we find that this line would have to recover $175,211 to avoid incurring an opportunity cost, not $208,351 as the Judge found. This $33,000 difference does not warrant a change in the result.

The petitioners assert on appeal that the ICC erred in using 9.3% rather than a lower figure (here suggested to be 2.4%). They urge the position that, in determining ICG's opportunity cost, the ICC should have adjusted the rate lower because ICG currently pays no federal income taxes. (Hence, there would be no need to adjust the weighted cost-of-capital to reflect a pretax analysis—since there is no tax paid.)

This identical argument was presented to the ICC in Illinois Central Gulf Railway Co. Abandonment, 363 ICC 729, 733–734 (1980). There, the ICC stated:

Application of the *Rock House* methodology to ICG does raise a significant issue on the role of the statutory tax rate in our computation of the pretax opportunity cost. ICG has not recently paid taxes. It could be argued that if a carrier does not pay taxes, it requires a lower pretax return in order to obtain the same post-tax return as that of a taxpaying carrier.

This argument, however, is not consistent with the concept of opportunity cost. ICG would have many of the same investment opportunities that other carriers would have, and could expect to obtain the same level of pretax income from such opportunities. We cannot reasonably assume that ICG will be less successful in its search ·for alternative investments than· more profitable carriers. The available pretax return to ICG or a more profitable carrier would be the same. Thus, the pretax opportunity cost would be the same regardless of the fact that ICG does not pay taxes and the more profitable carrier does.

Moreover, an adjustment for nonpayment of taxes would discriminate against less successful carriers and in favor of more successful ones. It would mean that a near bankrupt carrier would find it more difficult to abandon its lines—because its opportunity cost would be deemed lower than a financially healthy carrier. (This result, which seems contrary to rational abandonment policy, could of course be mitigated by the fact that opportunity cost is only one of the factors to be considered in abandonment proceedings.)

Another reason for refusing to decrease the cost of capital for carriers which do not pay taxes is that it grossly undervalues an asset in those carriers hands. The rail assets of the ICG could very readily be used on another rail line to recover a pretax cost of capital

 

The petitioners' assertion that the ALJ (and by adoption the ICC) failed to consider the effect of the abandonment on rural and community development is completely unwarranted. In his decision, Administrative Law Judge Joyner stated:

> The Commission has often recognized that in almost every abandonment there will be inconvenience or disruption to shippers and local communities. This is not the controlling factor. [Citations omitted.] The courts have recognized that if a railroad abandonment had to depend on proof that affected communities or shippers would suffer no inconvenience or economic loss, few, if any, lines would ever be abandoned.

Finally, the ALJ (and hence the ICC in affirming the ALJ) also determined that the two major shippers could transport their products by truck after the abandonment. As the ALJ stated, "By their use of alternative means of transportation, protestants have [already] demonstrated that although it is more expensive, it is feasible." The only reason the petitioners assert that alternative modes of transportation are not feasible is because of the increase IP and Masonite would incur in freight charges each year. The ALJ (and ICC) properly weighed this factor in concluding, as stated previously, that "[t]he continued operation of the line merely to benefit the protestants would be an unnecessary burden upon interstate commerce."

*Conclusion*

Because we find that the order of the ICC granting abandonment was supported by substantial evidence, we affirm.

AFFIRMED.

---

of 9.3 percent. Thus the rate of return any firm should receive from using that asset is 9.3 percent. Opportunity costs reflect the return available from an asset if it were put to an alternative use, and we should not assume that these alternative uses are limited to the ICG system. Our focus is on the return available through sale or reuse of the asset, not on the return currently experienced by a particular carrier.

Petitioners urge us to rule that a pretax upward adjustment of the cost-of-capital figure is improper when the railroad pays no taxes. Although we find the reasons enunciated by the ICC in *Kevil* to be very persuasive for not adopting the petitioners' view, we find it unnec-essary for purposes of deciding the present case to rule on this issue. (We note that the same issue is pending review in the United States Court of Appeals for the Sixth Circuit in *Ballard County Rail Users, et al. v. ICC*, No. 81–3070.)

Here, even if we adopt the petitioners' view that the rate-of-return of 2.4% should be applied to the net liquidation value of $1,883,992, ICG would still incur an opportunity cost of $45,216. When considering this to be simply one factor to be weighed in determining whether abandonment is warranted, we would still be unable to state that the ICC's decision was not supported by substantial, albeit somewhat less, evidence.