**GULF OIL CORPORATION, Appellant,**

v.

**RAILROAD COMMISSION OF TEXAS, et al., Appellees.**

**No. 13675.**

Court of Appeals of Texas, Austin.

Sept. 7, 1983.

Rehearing Denied Nov. 2, 1983.

Robert L. Ketchand, Butler, Binion, Rice, Cook & Knapp, Washington, D.C., C. Burton Branstetter, Houston, for appellant.

Mark White, Atty. Gen., J. Scott Wilson, Asst. Atty. Gen., Austin, for Railroad Commission of Texas.

Barry Bishop, Clark, Thomas, Winters & Shapiro, Austin, for Texas Electric Service Co.

Shannon H. Ratliff, Thomas O. Barton, McGinnis, Lochridge & Kilgore, Austin, for Odessa Natural Co.

Jeb Loveless, Burford & Ryburn, Dallas, for Texas Power & Light Co.

Before SHANNON, POWERS and GAMMAGE, JJ.

POWERS, Justice.

We review a judgment sustaining a final order issued by the Texas Railroad Commission in an administrative proceeding denominated "Gas Utilities Docket 1813" (GUD 1813). Gulf Oil Corporation, adversely affected by the order, sued in district court

for judicial review.[1] The district court sustained the order. We affirm the judgment of the district court.

## PROCEEDINGS IN THE COMMISSION

In 1962 Gulf contracted to sell natural gas to Odessa Natural Company from Gulf's Sand Hills Plant in Crane County, Texas. The contract specified a fixed unit price for the gas sold thereunder. Odessa, in turn, contracted to sell the gas at a fixed price to Texas Electric Service Company (TESCO). TESCO generates electricity from the natural gas and sells the electricity under various contracts to Texas Power & Light Company (TP & L), other wholesale purchasers of electric power, and numerous residents of cities, towns, and villages exercising regulatory power over electric rates. TP & L markets the electricity in the same manner. In each sale of electricity mentioned above, the electricity is sold at a contract price or regulatory rate that varies with the cost of the natural gas from which the electricity is generated by TESCO.

In 1969 Lo-Vaca Gathering Company (Lo-Vaca) contracted to supply Gulf with natural gas sufficient to enable Gulf to meet its contract commitment to Odessa, *in the event* Gulf's gas supply at its Sand Hills Plant became insufficient to meet its contract commitment to Odessa. Gulf's contract with Lo-Vaca established for any natural gas sold thereunder a unit price that varied according to Lo-Vaca's cost.

Gulf had not taken any natural gas from Lo-Vaca, under their 1969 contract, when the Commission issued in 1973 an interlocutory order in an administrative proceeding designated "Gas Utilities Docket 500" (GUD 500), wherein Lo-Vaca had requested that the Commission review and revise the prices established in Lo-Vaca's contracts to supply natural gas. Tex.Rev.Civ.Stat. Ann. arts. 6053, 6054 (1962). The Commission, in its interlocutory order, set an official price for natural gas sold by Lo-Vaca, determinable from a formula prescribed in the order, and suspended any lower prices established in Lo-Vaca's contracts with its customers, including Gulf's 1969 contract with Lo-Vaca.

Beginning in February 1976, or about three years after the date of the Commission's interlocutory order in GUD 500, Gulf began to take deliveries of natural gas from Lo-Vaca under their 1969 contract. Gulf paid Lo-Vaca for the gas at the unit price established by the Commission in its interlocutory order.

Gulf, in turn, delivered the Lo-Vaca gas to Odessa in performance of Gulf's 1962 contract with Odessa. Gulf billed Odessa for the gas in an amount based upon the unit price fixed in their 1962 contract, augmented by additional sums constituting the difference between what Gulf would have paid Lo-Vaca under their 1969 contract and the greater amount actually paid by Gulf based upon the unit price established by the Commission for Lo-Vaca gas. In effect, Gulf attempted to "flow through" to Odessa the increased cost it had incurred for the Lo-Vaca gas, over and above its 1969 contract with Lo-Vaca. Insisting upon the price established in its 1962 contract, Odessa refused to pay the additional sums demanded by Gulf.

In November 1978, Gulf filed with the Commission, in GUD 500, a request that Odessa be ordered to pay the additional sums. The Commission severed the matter from GUD 500 and directed that Gulf's request be heard and determined in a new proceeding, GUD 1813. Because of the likelihood they would be affected if the Commission required Odessa to pay the increased cost of Lo-Vaca gas, TESCO, TP & L, some of their wholesale electric power

---

1. The Texas Railroad Commission, and its commissioners, were defendants in Gulf's suit for judicial review. Numerous parties intervened in the district court: Odessa Natural Company, a purchaser of natural gas from Gulf, nine corporations and cooperatives supplying electricity, and seventy-two municipalities exercising regulatory power over electric rates within their municipal limits. The following appellees have filed briefs on appeal: the Commission, Odessa Natural Company, Texas Power & Light Company, and Texas Electric Service Company.

customers, and some of the municipalities intervened in GUD 1813.

During December 1979, hearings in GUD 1813 were conducted by an examiner appointed by the Commission. After the hearings concluded, the examiner on February 1, 1980 was promoted to another position and was relieved of responsibility for GUD 1813. The Commission, on August 20, 1980, appointed another examiner in GUD 1813. He prepared a proposal for decision based upon his reading of the administrative record compiled in GUD 1813. The proposal was served the parties on September 10, 1980.

The proposal for decision recommended that the Commission deny Gulf's request for "flow through" authority.[2] The supporting analysis rebutted in several ways the arguments attributed to Gulf: that Gulf was simply requesting enforcement of

2. As will be seen in the text of the opinion, Gulf complains of the form of the proposal for decision, as well as its force or effect. We will therefore quote at some length from the proposal for decision, which reads in part as follows:

In the Examiner's judgement [sic], Gulf failed to show any reason why revision of the "Odessa Amendment" would be in the public interest. In fact, the basis of Gulf's case essentially was grounded upon a Docket No. 500 "fairness" argument. First, Gulf claimed that it should not be treated differently from other companies involved in similar, prior dockets. Second, Gulf contended that it would be unfair for the Commission to increase the Lo-Vaca/Gulf price without also increasing the Gulf/Odessa price.

Although fairness should be considered in evaluating the public interest, fairness to Gulf *alone* would amount to a one-sided analysis. Instead, the Commission should assess this issue in light of fairness to all concerned. From Gulf's vantage point, denial of the company's request probably would result in diminished profits. This fact, although significant, is outweighed by other considerations. For *at least* the following reasons, revision of the "Odessa Amendment" appears contrary to the public interest.

1. Gulf was not *required* to satisfy its commitment to Odessa with purchases from Lo-Vaca. In fact, Gulf's actions were voluntary.

2. Gulf assumed the risk of dealing with Lo-Vaca. Although the "Deficiency Contract" was executed prior to Gulf's knowledge of the "Lo-Vaca problem," Gulf's *first* deficiency purchase was made in 1976, approximately three years following the commencement of proceedings in Docket No. 500. It appears, therefore, that Gulf purchased gas from Lo-Vaca in anticipation of subsequent flow-through to Odessa.

3. Gulf claimed that increased costs should be flowed-through to the ultimate consumer (or at least to Odessa), since the "benefits" arising from the resolution of Docket No. 500 also would be flowed-through. The Company failed to identify any benefits applicable to Odessa in particular, nor could it do so, since the gas purchased from Lo-Vaca essentially amounted to a repurchase or "swap" of gas previously sold to Lo-Vaca by Gulf.

4. It appears that Gulf at certain times had available other gas which could have been used to satisfy the Odessa commitment. To the extent that this situation existed, purchases from Lo-Vaca were unnecessary.

5. If Gulf's request were denied, the financial impact to the company readily could be borne by the shareholders. In fact, it might not even be noticed by Gulf's shareholders.

6. If the *High Plains* test did apply, Gulf admitted that it could not meet the standards set out therein.

7. "Future" flow-through, if any, depends strictly upon Gulf's election to purchase from Lo-Vaca. If flow-through is denied, future deficiency purchases from Lo-Vaca are unlikely.

8. If flow-through were allowed, Gulf would be guaranteed all of the benefits of its bargain with Lo-Vaca, and all of the detriments would be passed along. Thus, Gulf would have the best of both worlds.

In the Examiner's opinion, Gulf's posture clearly is distinguishable from that of other Companies involved in prior dockets, and different treatment herein is justified.

FINDINGS OF FACT

\* \* \* \* \* \*

3. Gulf sells some of its own production to Lo-Vaca while retaining the right to repurchase limited quantities of gas from Lo-Vaca.

\* \* \* \* \* \*

9. Gulf is not contractually required to purchase gas from Lo-Vaca (or its successor) in order to meet its contractual commitment to Odessa.

\* \* \* \* \* \*

CONCLUSIONS OF LAW

\* \* \* \* \* \*

2. The Commission's Orders in Gas Utilities Docket No. 500 cannot be enforced against Odessa Natural Corporation in the manner suggested by Gulf.

\* \* \* \* \* \*

4. A valid contract cannot be revised by the Commission unless it is in the public interest to do so.

5. Gulf has failed to show the relief requested to be in the public interest.

the Commission's orders previously issued in GUD 500; and, if Gulf's request for "flow through" authority could only be granted on a showing and finding that such authority was in the public interest, then the requisite showing and finding had been made previously in GUD 500. Disagreeing with these propositions, the examiner in his proposal concluded: (1) the previous orders in GUD 500 were not enforceable against Odessa, in the manner suggested by Gulf, because Odessa was not a party in GUD 500; (2) the Commission lacked power to revise the price stipulated in Gulf's contract with Odessa unless it is in the public interest to do so, and Gulf had not shown that the public interest required such revision with respect to the Odessa contract; and (3) the requisite public-interest showing was required to be made in GUD 1813, for in GUD 500 the Commission had *not* found that a revision of the prices established in Gulf's contracts with third parties, such as Odessa, was in the public interest.

The proposal for decision does not express precisely what Gulf had to show to demonstrate that revision of the price set in its contract with Odessa was in the public interest; rather, the proposal reflects the examiner's explanation that the record had been "scrutinized" to discover *how* revision of the Odessa contract price might serve the public interest, in light of Gulf's basic argument, which the proposal characterizes as a "fairness" argument, whereby Gulf contended that it would be unfair to treat Gulf differently from other Lo-Vaca purchasers who had been previously granted "flow through" authority, and unfair to increase Gulf's cost for Lo-Vaca gas without simultaneously increasing Odessa's cost. The proposal for decision concludes with eleven findings of fact and five conclusions of law, some of which are quoted in footnote two.

On November 10, 1980, the Commission issued its final order in GUD 1813, approving the proposal for decision and adopting and incorporating the findings of fact and conclusions of law contained therein. Gulf sued the Commission for judicial review of the order and Odessa, TESCO, TP & L, and others intervened. Gulf now appeals from the district court judgment affirming the final order in GUD 1813. We shall summarize Gulf's points of error.

## SUMMARIES OF GULF'S POINTS OF ERROR

### Unjust Discrimination

Gulf contends that in earlier administrative proceedings the Commission repeatedly recognized that other Lo-Vaca purchasers had a "right" to "flow through" to their customers the increased cost of natural gas resulting from orders entered by the Commission in GUD 500. Gulf refers to administrative proceedings in GUD 628 ("Union Texas"), GUD 1701 ("Lone Star"), and GUD 1702 ("Amoco"). Gulf complains that the Commission refused Gulf the identical relief but failed to justify in its final order such different treatment, which is therefore arbitrary, capricious, discriminatory, and the result of an abuse of discretion by the Commission. Tex.Rev.Civ.Stat.Ann. art. 6252–13a, Administrative Procedure and Texas Register Act (APTRA), § 19(e).

### The Public-Interest Prerequisite for Revision of Contract Prices

Gulf disputes the Commission's conclusion that Gulf had failed to demonstrate in GUD 1813 that revision of its contract price with Odessa was in the public interest, and challenges the Commission's refusal, on that ground, to grant Gulf "flow through" authority in derogation of the Odessa contract price.

Gulf argues that the Commission's conclusion and action are inconsistent with its conclusions and actions in *Lone Star* and *Amoco* where the Commission had, in the public interest, authorized other purchasers of Lo-Vaca Gas to "flow through" to their customers the increased costs occasioned by the Commission's orders in GUD 500, such relief being found by the agency to be necessary in order to assure ultimate consumers a sufficient supply of natural gas, an assurance effectuated by providing Lo-Vaca sufficient income to purchase natural gas for its system.

Conceding that the Commission's order in GUD 500 contemplated that "flow through" authority would be given only in subsequent administrative proceedings initiated by purchasers of Lo-Vaca gas, Gulf contends that the *right* of those purchasers to recoup from their customers the increased costs was nevertheless established in GUD 500, and the Commission did not contemplate that the subsequent requests for "flow through" authority would have to be justified by a separate and independent showing that they were required in the public interest. Rather, Gulf argues, the Commission intended that subsequent requests for "flow through" authority would present issues involving solely the "mechanics" of the "flow through," such as a determination of the amount of the purchaser's increased cost for Lo-Vaca gas, over and above what the cost would have been under the purchaser's contract with Lo-Vaca, and the method by which the increase would be recovered from the purchaser's natural gas customers. Any other interpretation of the orders in GUD 500 would, according to Gulf, render superfluous and meaningless the language contained in those orders wherein the Commission purported generally to authorize such "flow through."

Gulf points out that the Commission did not purport to apply in GUD 1813 the precise grounds for contract-price revision specified in *High Plains Natural Gas Company v. Railroad Commission of Texas,* 467 S.W.2d 532, 537 (Tex.App.1971, writ ref'd n.r.e.). *High Plains* required for such relief a demonstration that continuance of the contract prices in force might impair the ability of the supplier of natural gas to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory. In fact, Gulf suggests, the Commission's final order in GUD 1813 admits "the absence of any clear public interest test" applicable to Gulf's peculiar circumstances. Nevertheless, Gulf complains, the Commission denied Gulf's application for "flow through" authority on the ground that Gulf had failed to show that such relief was required in the public interest; and instead of applying any articulated public-

interest "test," the Commission in its final order merely listed factual distinctions between Gulf's circumstances, as found in GUD 1813, and circumstances found in previous administrative proceedings wherein "flow through" authority had been granted other Lo-Vaca purchasers. Gulf asserts, therefore, that the agency's omission to articulate and apply in GUD 1813 any specific legal standard, expressed as a public-interest "test," renders immaterial any difference in circumstances because such distinctions can have legal and practical meaning only in reference to such a standard.

The fundamental difference in Gulf's circumstances, as compared to those of the other purchasers of Lo-Vaca gas referred to, as enunciated in the proposal for decision adopted by the Commission, is this: "Gulf was not required to satisfy its commitment (to Odessa) with purchases from Lo-Vaca," but did so voluntarily; that Gulf "at certain times" owned other natural gas which was available to satisfy the Odessa commitment, making purchases from Lo-Vaca unnecessary; and that Gulf's purchases from Lo-Vaca depended "entirely on Gulf's election." Gulf reasons that nothing in the Commission's previous orders in *Union Texas, Lone Star,* or *Amoco* indicated that availability of other sources of natural gas or a compulsion to buy from Lo-Vaca, as opposed to a voluntary election to do so, would affect the Commission's ultimate determination as to whether "flow through" authority was in the public interest. And Gulf points out that the Commission granted such authority in *Lone Star* and *Amoco* even though the Commission's orders in those proceedings reflect that Lone Star "purchases only a portion of its system's supply" from Lo-Vaca and that "Amoco is entitled to obtain a portion of its system's supply" from Lo-Vaca. Gulf disputes the other factual distinctions relied upon by the Commission to deny Gulf the flow through authority that the Commission had granted to other Lo-Vaca customers. Gulf concludes that the Commission's determination to deny Gulf "flow through" authority, on the ground that Gulf had not shown that

such relief was in the public interest, was arbitrary, capricious, discriminatory, an abuse of discretion, and unsupported by substantial evidence. APTRA § 19(e).

*The Commission's Refusal to Enforce Against Odessa the Orders Issued in GUD 500, on the Ground that Odessa Was Not a Party in GUD 500*

Gulf challenges the Commission's determination that its orders in GUD 500, authorizing Lo-Vaca's purchasers to "flow through" the increased cost of Lo-Vaca gas, could not be enforced against Odessa because it was not a "party" in GUD 500. Gulf's argument in this regard addresses issues involving the kind of notice required to bind non-participants to the result reached by the Commission in GUD 500. In light of the assumptions we make in this appeal, stated below, we need not discuss Gulf's contentions in this regard.

*The Commission's Action in Substituting a New Examiner*

Gulf contends the Commission violated its own rules and Gulf's right to due process of law because the hearings examiner who conducted the hearings in December 1979 failed to prepare the proposal for decision when he was able to do so. Gulf argues that the original examiner was required to prepare the proposal for decision because only he could properly evaluate testimonial evidence affected by the demeanor of the witnesses, so as to be in a position adequately to resolve conflicts in the evidence. Further, Gulf asserts, the promotion of the original examiner was, under the Commission's rules, an insufficient reason for replacing him, some six months afterwards, through appointment of the new examiner.

*Insufficiency of the Proposal for Decision*

Gulf charges that the proposal for decision in GUD 1813 was so inadequate that it violated the statutory requirement that proposals for decision be prepared and served the parties after conclusion of administrative hearings in contested cases. APTRA § 15. More particularly, Gulf asserts that the proposal served in the present case did not present to the Commission sufficient information from which it could make a fully informed decision. Gulf contends for example that the proposal did not address with sufficient particularity the Commission's orders in GUD 500, the orders in *Union Texas, Lone Star,* and *Amoco,* the circumstances surrounding the execution and operation of the pertinent contracts, or the demeanor of the witnesses who testified in GUD 1813. Gulf also complains that the proposal failed adequately to present Gulf's contentions to the Commission. And because the insufficient proposal for decision was the sole basis upon which the Commission reached its decision, Gulf argues, the Commission failed to engage in reasoned decision-making in arriving at its final order in GUD 1813.

## ASSUMPTIONS ON APPEAL

We shall assume, without deciding or validating, the following propositions necessary to Gulf's arguments on appeal:

1. The Commission is empowered to authorize Lo-Vaca customers such as Gulf to "flow through" to their customers any increase in the cost of natural gas occasioned by the Commission's orders in GUD 500, even if a particular customer, such as Gulf, is not a "gas utility" as that term is defined in Tex.Rev.Civ.Stat.Ann. art. 6050 (1962). (Odessa has contended throughout GUD 1813, and on judicial review, that Gulf is not a "gas utility" as defined in that statute and is therefore not entitled to obtain relief from its contract prices by the Commission's exercise of its regulatory power to fix natural gas prices for "gas utilities," a power conferred upon the agency by the terms of Tex.Rev.Civ.Stat.Ann. art. 6053 (1962)).

2. The right of Lo-Vaca natural gas purchasers to "flow through" their increased costs may be enforced against their customers, even though the customers were not parties in the administrative proceedings in GUD 500, wherein the right of "flow through" was granted.

3. We may consider orders issued by the Commission in *Union Texas, Lone Star,* and

*Amoco* to determine whether in GUD 1813 the Commission acted discriminatorily, arbitrarily, and capriciously, or in an abuse of discretion, notwithstanding that copies of those orders and other pertinent documents were not received in evidence in GUD 1813 and do not form part of the administrative record therein or the record on appeal to this Court.[3]

4. The effect of the Commission's orders in GUD 500 is to confer upon those purchasers of Lo-Vaca gas to which the orders apply a right to "flow through" to their customers the increased cost of the gas, subject only to their establishing the "mechanics" necessary to implement the right, leaving the issue in the present appeal to be whether the Commission could properly conclude that Gulf is not a purchaser of Lo-Vaca gas to which the right of "flow through" was given in GUD 500, insofar as Gulf claims the right on the basis of gas purchased by it from Lo-Vaca, under their 1969 contract, to meet Gulf's 1962 contract commitment to deliver natural gas to Odessa.

The foregoing assumptions require, of course, other assumptions about other legal issues, but these need not be discussed in the present appeal.

## HOLDINGS AND DISCUSSION

■ We hold that the Commission could properly conclude that Gulf was not in the category of Lo-Vaca gas purchasers granted a right of "flow through" by orders issued in GUD 500. The Commission's "clarification" of its interlocutory order in GUD 500 authorized the "flow through" of "additional gas cost incurred ... as a result of the Interlocutory Order," an order entered by the Commission "to avert or mitigate human suffering, particularly during the winter heating season, due to the serious short-fall of gas on the Lo-Vaca system." The interlocutory order and its "clarification" resulted from the "Lo-Vaca problem" now to be described briefly.

Lo-Vaca was obligated to deliver natural gas to its purchasers, generally under long-term contracts having fixed unit prices that were low in comparison to a market price that increased dramatically during the terms of the contracts. Lo-Vaca generally obtained the natural gas at the market price. The unit prices fixed in Lo-Vaca's contracts with its purchasers eventually failed to produce sufficient income to enable Lo-Vaca to acquire a quantity of natural gas, at market prices, to meet its contract commitments to deliver natural gas. Without an upward revision of the prices fixed in those contracts, it became apparent

**3.** At oral argument, we raised the rather serious difficulty of attempting to evaluate and determine Gulf's contentions on appeal, insofar as they depend upon what the Commission did or did not do in *Union Texas, Lone Star,* and *Amoco,* when no portions of the orders or records in those proceedings were introduced in evidence in GUD 1813, nor made the subject of official notice therein, and none are contained in the record on appeal, although portions are found in the briefs of the parties.

In a post-submission brief, Odessa points out that the record in GUD 500 was not officially noticed by the Commission in GUD 1813, nor were the records in the other proceedings; that no party requested that the Commission take such notice; the documents from the other proceedings could not have been officially noticed except in compliance with the procedure mandated by APTRA § 14; and we may not take judicial notice of those other records without depriving Odessa of its right to contest the facts we may deem true by way of judicial notice.

Gulf replies that we may properly examine copies of the Commission's orders in GUD 500 and the other proceedings to ascertain the different treatment afforded Gulf's request for "flow through" authority in GUD 1813, for the reason that the orders in GUD 500 and other proceedings were referred to in the proposal for decision in GUD 1813. Gulf cites *Big Three Industries, Inc. v. Railroad Commission of Texas,* 618 S.W.2d 543, 549 (Tex.1981). Moreover, Gulf asserts that the orders in GUD 500 were referred to throughout the proceedings in GUD 1813 and were reported in the "Gas Utilities Bulletin," a "regular reporting system of the Railroad Commission," citing *Southwestern Bell Telephone Co. v. Nash,* 586 S.W.2d 647, 648–49 (Tex.Civ.App.1979, no writ).

We assume for purposes of the present appeal, without deciding the matter, that we may examine and consider the Commission's actions in GUD 500 and the other proceedings based upon copies of documents therefrom furnished us by the parties on appeal.

that Lo-Vaca would be unable to meet its commitments to deliver gas thereunder, irrespective of any legal remedy available to the purchasers. Lo-Vaca applied to the Commission for relief in a proceeding denominated GUD 500.

Pending a final decision in GUD 500, the Commission found, on Lo-Vaca's application, the existence of a "public emergency and imperative public necessity" that required temporary relief. To meet that emergency and necessity, the Commission issued its interlocutory order in GUD 500, requiring that purchasers of Lo-Vaca gas pay a unit price slightly higher than the price paid by Lo-Vaca. The 1973 interlocutory order made the interim rate "applicable to all customers of Lo-Vaca now paying a lower rate" and provided further that any Lo-Vaca "customer shall be entitled to file for special relief regarding implementation of the interim rate or curtailment [of gas, as ordered in another administrative proceeding] resulting from existing circumstances pursuant to orders currently in force and effect as may be in the public interest." The interlocutory order did not specifically mention the possibility of a "flow through" by Lo-Vaca customers of their increased costs.

Some of the purchasers from Lo-Vaca were contractually bound to resell to third parties the natural gas obtained from Lo-Vaca, at a fixed price higher than the price stipulated in their contracts with Lo-Vaca but lower than the price established for Lo-Vaca gas in the interlocutory order. The unfairness of requiring such purchasers from Lo-Vaca to bear the *entirety* of the cost increase became apparent. In April 1974, the Commission purported to "clarify" its interlocutory order in GUD 500. It did so by authorizing purchasers of Lo-Vaca gas to "flow through" their increased costs; that is, the Commission authorized them to recoup from their customers the difference between what their costs would have been under their contracts with Lo-Vaca and the costs they had been required to pay Lo-Vaca as a *result* of the Commission's interlocutory order in GUD 500. Believing that such "flow through" was "the only fair and

equitable means of administering the additional gas cost," in light of the fact that the ultimate consumers of Lo-Vaca gas were the "ultimate beneficiaries of any improvement in Lo-Vaca's gas supply situation," the Commission ordered as follows:

> Accordingly, direct or indirect pipeline customers of Lo-Vaca should be allowed to flow-through any additional gas cost incurred by such pipeline customers *as a result of the Interlocutory Order.* The direct or indirect pipeline customers of Lo-Vaca will allocate the cost of the Lo-Vaca gas among all of its [sic] customers benefiting [sic] from such gas, and any increased charges to its customers will be subject to Commission review.

(emphasis added). One observes that the "clarification" contemplated cost increases incurred *as a result* of the interlocutory order in GUD 500 and the rationale for the "flow through" was one of "fairness."

The issue of "fairness," and the possibility of "unfairness," arose not from the fact that the purchasers of Lo-Vaca gas had entered into contracts with Lo-Vaca that proved ultimately to be unwise; rather, they had entered into contracts to resell the gas to third parties at prices established in *reliance* upon Lo-Vaca's contract commitment to sell them the gas at a lower price. In this regard, the purchasers from Lo-Vaca contemplated the risk of escalating prices for natural gas and took a reasonable precaution in that regard, by attempting to assure themselves of a supply of natural gas at a lower price. On the other hand, Lo-Vaca committed itself to supply its purchasers with natural gas at a fixed price without having previously contracted to purchase, or otherwise assuring itself a supply of natural gas, at a lower price, thereby assuming the risk that escalating market prices might place Lo-Vaca in a position of being unable to fulfill its contract commitments to its customers. The rationale of "fairness" was directed at the position of captive purchasers of Lo-Vaca gas—those who were *required* to buy gas from Lo-Vaca and committed to sell at a lower price than they were forced to pay for the gas,

notwithstanding their efforts to avoid precisely that situation. Gulf was not required, by contract or otherwise, to buy natural gas from Lo-Vaca, under the findings of fact and conclusions of law made by the Commission.

The Commission has, of course, the power to interpret its previous orders in an administrative proceeding. *Sunset Express, Inc. v. Gulf, C & S F. Ry. Co.*, 154 S.W.2d 860, 862 (Tex.Civ.App.1941). In the Commission's final order in GUD 1813 it unequivocally determined that Gulf was not in the same position as the other purchasers of Lo-Vaca gas to whom the Commission, in GUD 500, intended to award "flow through" authority and that is the essence of the agency's order in GUD 1813.

■ Under Gulf's 1969 contract with Lo-Vaca, the former was not required to purchase any gas at all; and the evidence shows, and the Commission expressly found, that Gulf could have fulfilled its contractual commitment to Odessa without purchasing gas from Lo-Vaca. The evidence upon which that finding was made includes evidence to the effect that Gulf sold its available natural gas to third parties because it could thereby obtain for its gas a price higher than that established in its contract with Odessa. The Commission's orders in GUD 500 manifest an unmistakable intent that the right of "flow through," which was a corollary of having one's contract price with Lo-Vaca suspended in favor of a higher official price, "as a result of the Interlocutory Order," was not for the purpose of allowing recoupment of *avoidable* losses but rather for the purpose of fairly distributing and diluting those *unavoidable* losses sustained as a result of the order notwithstanding one's specific attempt to guard against them in the form of a contract with Lo-Vaca to supply gas at a price suspended by the Commission. We find the Commission's interpretation of its previous orders in GUD 500 to be reasonably within the terms of those orders.

The Commission could therefore properly decide, as it did in GUD 1813, that the increased cost of Lo-Vaca gas sought by Gulf to be recovered from Odessa did not *result* from the Commission's interlocutory order in GUD 500, and was not within the category of increased costs for which Gulf could sustain a claim of recoupment or "flow through" under the Commission's "clarification," because any loss sustained by Gulf was avoidable and, in fact, *voluntarily* incurred. The Commission reasoned, in its final order in GUD 1813, that because "Gulf was not required to satisfy its commitment to Odessa with purchases from Lo-Vaca," the right of "flow through" would be perverted if Gulf were "guaranteed all of the benefits of its bargain with Lo-Vaca" while compelling Odessa, and its customers and the ultimate consumers, to bear "all of the detriments" of the "Lo-Vaca problem," presumably the curtailment and increased cost of natural gas.

We have no difficulty in following the distinctions articulated by the Commission in comparing Gulf's circumstances with those of other Lo-Vaca purchasers, and upon which the agency relied in denying Gulf's application for "flow through" authority; moreover, we find no invalidity in the result reached by the Commission. *Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974); *Mutual Bldg. and Loan Ass'n v. Lewis*, 572 S.W.2d 771, 777 (Tex.Civ.App.1978, no writ).

The Commission has made findings of basic fact evidencing its consideration of the factors relevant to its finding of ultimate fact that the "flow through" demanded by Gulf was not supported by a showing that such would be in the public interest, and we may not say that the agency has made a clear error of judgment in that regard. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Railroad Commission of Texas v. Graford Oil Corp.*, 557 S.W.2d 946, 950 (Tex.1977). We are aided in our review by the fact that the Commission's policy and judgment in authorizing "flow through" is not in this instance based upon the agency's peculiar expertise in technical aspects of the industry that it regulates.

Rather, the Commission's decision to deny Gulf such authority in the present case is based expressly upon a rationale of "fairness" as discussed at length above. In light of that rationale, we are fully able to understand the significance of the Commission's findings of fact and conclusions of law, as those are incorporated in the Commission's final order in GUD 1813. They amply demonstrate that the "fairness" rationale is not applicable to Gulf's circumstances because Gulf was not compelled to bear any additional cost for natural gas as a result of the agency's interlocutory order in GUD 500, from which the corollary right of "flow through" was derived.

■ Accordingly, we reject Gulf's argument that the Commission was required to explain more fully than it did the significance of factual differences between the circumstances of Gulf as compared to those found to exist in *Union Texas, Lone Star,* and *Amoco.*

■ We also reject Gulf's arguments that the Commission's final order in GUD 1813 is invalid because nothing in the proceedings in GUD 500, *Union Texas, Amoco,* or *Lone Star* suggested that "flow through" relief would be denied Gulf on the basis of the "fairness" rationale discussed above. On the contrary, we find that such rationale was made abundantly clear by the Commission in GUD 500; moreover, it is the nature of contested-case adjudications that legal standards (such as the public-interest standard relied upon by the Commission) are specified as they are required to be applied to new factual situations developed in a case under consideration.

*Accordingly, the Commission's final order in GUD 1813 may not be held invalid on the ground that the agency failed therein to formulate a precise and specific "test" akin to the public interest "test" articulated in High Plains, supra.* The Commission's interlocutory order in GUD 500 expressly provided that any Lo-Vaca customer, "shall be entitled" to seek from the Commission "special relief regarding implementation of the interim rate ... as may be in the public interest." If Gulf contended that revision

of its contract price with Odessa was required "in the public interest," as provided in the interlocutory order, it was Gulf's burden to support its application for such relief by specifying and showing the particular public interest at risk and how maintaining the existing contract price in force would adversely affect that interest; moreover, Gulf had the burden of persuasion in that regard. It is sufficient in such circumstances that the Commission considered the relevant factor of public interest when, in the words of the proposal for decision, the record in GUD 1813 was "scrutinized ... in an attempt to ascertain the extent, if any, to which a revision of the [contract price] would serve the public interest" in *any* respect sufficient to demonstrate the necessity of formulating and applying any particular tenets comprising a public interest "test."

Nor is the Commission's order invalid because the agency's previous orders in *Amoco, Union Texas,* and *Lone Star* did not *expressly articulate and rely* on the proposition that the Lo-Vaca purchasers seeking "flow through" authority in those cases were *required* to buy gas from Lo-Vaca. Gulf's argument is, of course, inherently weak because it is an argument from silence alone. In *Amoco, Union Texas,* and *Lone Star,* as evidenced by the documents furnished us on appeal, the Commission did not have before it an application for "flow through" authority filed by a purchaser of Lo-Vaca gas occupying the distinctly different circumstances of Gulf, which was *not* required to buy gas from Lo-Vaca. Therefore, the Commission had no occasion to distinguish such possible circumstances when it formulated its final orders in those proceedings.

■ We hold, in addition, that the Commission's order in GUD 1813 is not invalid on the ground that the proposal for decision was composed by an examiner who did not conduct the hearings, and not invalid on the ground that it is insufficient in its terms.

Section 15 of APTRA provides in part as follows:

The proposal for decision must contain a statement of the reasons for the proposed

decision and of each finding of fact and conclusion of law necessary to the proposed decision, *prepared by the person who conducted the hearing or by one who has read the record.*

(emphasis added). The foregoing sentence unambiguously provides that one may prepare the proposal for decision if he "has read the record," even if he was not the individual who "conducted the hearing." Section 15 does *not* provide that one who has merely "read the record" may compose the proposal for decision only when the individual who conducted the hearing is unable to prepare the proposal for decision; rather, the authorization contained in the quoted part of § 15 is unconditional as well as disjunctive. Presumably, the Legislature in its enactment of § 15 considered that the examiner who merely read the record would have no opportunity to observe the demeanor of the witnesses, but nevertheless authorized such examiners, on grounds of administrative convenience, to prepare proposals for decision. Moreover, in the present appeal, we observe that the facts essential to the Commission's decision and our review were largely established by documentary evidence or uncontradicted testimony.

A rule of the Commission, 16 TAC § 1.111, cited by Gulf, is substantially identical to the provisions of APTRA § 15; however, as also pointed out by Gulf, another Commission rule, 16 TAC § 1.72, which establishes some of the powers and duties of hearings examiners, provides as follows:

If the examiner is *unable to continue* presiding over a case at any time before the final decision, another examiner will be appointed who shall perform any function remaining to be performed without the necessity of repeating any previous proceeding.

(emphasis added). Gulf contends that this part of 16 TAC § 1.72 qualifies or conditions the more general authority given in APTRA § 15 and 16 TAC § 1.111, permitting the proposal for decision to be composed either by one who conducted the hearing or by one who has read the record compiled therein; and Gulf infers that one who did not conduct the hearing may pre-

pare the proposal for decision *only* when there exists a necessity that he do so.

We disagree with Gulf's interpretation of the rules and § 15 of APTRA. It is apparent to us that 16 TAC § 1.72 addresses a specific situation where a hearings examiner may be substituted in the course of an administrative hearing, because the original examiner is "unable to continue," and provides that the proceedings need not commence anew. And, this is *made possible only* because the substitute is empowered by APTRA § 15 and 16 TAC § 1.111 to prepare a valid proposal for decision based upon that portion of the record made in his absence, as well as that portion reflecting the proceedings over which he presided. We find no conflict in the rules and the statute. And if any showing of necessity was required in the present case, for the substitution which occurred, there is nothing in the present record which suggests that the showing was not made.

■ We disagree as well with Gulf's contention that the proposal for decision served in the present case was, by its terms, insufficient to comply with the mandate of APTRA § 15 that "[t]he proposal for decision must contain a statement of the reasons for the proposed decision and of each finding of fact and conclusion of law necessary to the proposed decision. . . ."

■ We have previously held herein that the Commission's final order, adopting the proposal for decision, contained sufficient findings of fact to support the Commission's finding of ultimate fact that "flow through" by Gulf would not be in the public interest. There was no necessity for the Commission to review in greater detail, in its order, the significance of the factual distinctions between Gulf's circumstances and those of other Lo-Vaca purchasers who had been granted "flow through" authority, or to review in greater detail the orders issued by the Commission in GUD 500. The significance of those matters is readily apparent to us, as it apparently was to the Commission, given the "fairness" rationale under which "flow through" authority was granted in the Commission's "clarification" of its interlocutory order in GUD 500.

Thus, the proposal for decision did not fail to present material and relevant factors for consideration by the Commission.

■ If one assumes, however, that the proposal for decision was insufficient to present the material and relevant considerations to the Commission, Gulf was not denied an opportunity to present to the Commission Gulf's contentions and supporting argument; indeed, Gulf filed detailed exceptions to the proposal for decision. Notwithstanding that the Commission denied Gulf's request for oral argument, relative to its exceptions, on the ground that "additional argument would be cumulative in nature," we must presume that the Commission gave due consideration to Gulf's exceptions. *Southwestern Greyhound Lines v. Railroad Commission,* 208 S.W.2d 593, 595–96 (Tex.Civ.App.1947, writ ref'd n.r.e.) (Commission presumed to have considered evidence of "service capable of being rendered" by existing carriers in its decision to grant certificate of convenience and necessity to new carrier).

We therefore overrule Gulf's points of error directed at the proposal for decision adopted by the Commission in its final order in GUD 1813.

Finding no error, we affirm the judgment of the district court.