Tammy COWHERD, Minnie Cox, Robin Jones, and Carolyn Olive, individually and on Behalf of all others similarly situated, Plaintiffs-Appellants,

v.

UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Samuel Pierce, as Secretary of HUD, Robert Kalish, as Director of HUD's Office of Multi-family Financing and Preservation, Phillip Winn, as Assistant Secretary of HUD–FHA Commission, Martha Lamkin, as Director of the Indianapolis Area Office, Paul D. Toller and Tee Harbor Associates, Defendants-Appellees.

No. 87–1074.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1987.

Decided July 22, 1987.

M. Patricia Smith, Legal Services Organization of Ind., Inc., Indianapolis, Ind., for plaintiffs-appellants.

Charles Goodloe, Jr., Asst. U.S. Atty., John Dnaile Tinder, U.S. Atty., Indianapolis, Ind., for defendants-appellees.

Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

The plaintiffs in this class action requested that the district court set aside HUD's sale of an Indianapolis housing project to a private owner. The plaintiffs argued that, because the project was sold without low-income rental subsidies, the sale violated 12 U.S.C. § 1701z–11 and its accompanying regulations, and was therefore arbitrary, capricious, and an abuse of discretion under the Administrative Procedure Act. The district court granted summary judgment to the defendants, and the plaintiffs appealed. We affirm the judgment of the district court.

## I.

Stonekey II is a forty-three building apartment complex on the southeast side of Indianapolis, Indiana. The project, which was originally known as Barrington Heights, was built in 1952 by private developers to provide modest-income housing for minority families. The project had a successful beginning. However, other housing alternatives for modest-income minority families became available over the years, and as these alternatives increased, Barrington Heights began to suffer from vacancies. By 1967, the original developers were losing money, and they sold the project for $1,688,400 to a nonprofit corporation, Flanner House Homes, Inc. HUD financed a rehabilitation of the project (renamed Stonekey II), and attached rent subsidies to the project, under which the agen-cy paid 40% of the rent of each qualified tenant.

Even under its new ownership, Stonekey II continued to fail. The administrative record reveals that the project was managed poorly. The poor quality of the rehabilitation work Stonekey II received, the dangerousness of the neighborhood, the relatively high rents in the project, and the large number of two-bedroom units in other buildings in the immediate area also contributed to a declining occupancy rate. As of 1973, only forty of the 100 rent-subsidized units were occupied, and the management agent stated that eligible tenants were unwilling to move into the buildings. A 1973 HUD narrative report from the HUD area office stated that "[t]he future for the subject project is extremely questionable."

In 1974, HUD acquired Stonekey II through a foreclosure sale. Under HUD's ownership, the occupancy rate and physical plant continued to decline. An April, 1976 memo from the HUD area office to the property disposition office in Washington noted that Stonekey II had never reached "sustaining occupancy," that the building had been severely vandalized, and that it was rat infested.

In 1980–1981, HUD conducted a property disposition analysis of Stonekey II and its companion project, Stonekey I. The HUD area office initially recommended demolition of Stonekey II, but later changed its recommendation to a sale without rent subsidies and without repair requirements. HUD adopted this latter course, and on July 12, 1982, HUD executed a contract to sell Stonekey II to Paul D. Toller for $5,000. The sale was "all cash," "as is," and Toller was given the discretion to raze or rehabilitate the project.

On August 3, 1982, seven plaintiffs brought suit in federal district court to enjoin the sale. Five plaintiffs were Stonekey II residents who would be displaced by the sale, and two were low-income persons who would be eligible to apply for housing in Stonekey II if it was sold with a rental subsidy. The plaintiffs argued that in the

absence of a rental subsidy, the sale of the project violated relevant statutes and regulations and was therefore arbitrary, capricious, and an abuse of discretion. The district court consolidated the hearing on the preliminary injunction with the trial on the merits, and entered judgment for the defendants. Title to Stonekey II passed from HUD to Toller on August 16, 1982.

This court, however, reversed the judgment of the district court and remanded the case for trial, because the plaintiffs had been prejudiced by the district court's "sudden and unannounced consolidation of the hearing on a preliminary injunction with a trial on the merits," *Paris v. United States Dep't of Housing & Urban Development*, 713 F.2d 1341, 1346 (7th Cir.1983). On remand, both sides moved for summary judgment, and the district court referred the case to a magistrate. On October 20, 1986, the magistrate entered his report, which recommended that the district court affirm HUD's sale of Stonekey II without rental subsidies. On December 30, 1986, over plaintiffs' objections, the district court adopted the magistrate's findings and recommendation. This appeal followed.

### II.

The Administrative Procedure Act ("APA") provides for judicial review of agency action, 5 U.S.C. § 702 (1982 & Supp. III 1985), as long as the action is a "final agency action for which there is no other adequate remedy in a court," *id.* at § 704. There are two situations, however, in which judicial review is unavailable: when a statute precludes review, *id.* at § 701(a)(1), and when the agency action is "committed to agency discretion by law," *id.* at § 701(a)(2). *See Turner v. United States Parole Comm'n*, 810 F.2d 612, 614 (7th Cir.1987). In this case, neither exception applies, and thus we may review HUD's action.

■ Section 706 of the APA sets forth our standard of review. That section provides that a reviewing court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982). Under the arbitrary and capricious standard, a reviewing court will uphold agency action that is "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *see Frisby v. United States Dep't of Housing & Urban Development*, 755 F.2d 1052, 1055 (3d Cir.1985). In this case, HUD's sale of Stonekey II was clearly within the statutory scope of its authority. Thus, we examine only whether HUD's decision to sell the property without rental subsidies was rational and based on consideration of the relevant factors.

In examining the administrative record, we must be mindful that agency action is given a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Although the court's inquiry "is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* at 416, 91 S.Ct. at 824. Moreover, as we have noted, "HUD is vested with considerable discretion to implement the various and often competing goals of the national housing policy." *Alschuler v. Dep't of Housing & Urban Development*, 686 F.2d 472, 481 (7th Cir. 1982).

### III.

#### A.

Appellants first argue that HUD's action in selling Stonekey II without rental subsidies was arbitrary and capricious because it ignored or thwarted the goals enumerated in the property disposition statute, § 203 of the Housing and Community Development Amendments of 1978, 12 U.S.C. § 1701z–11 (1982). We reject this argument.

The property disposition statute sets forth six policy objectives which HUD must attempt to further at the least cost possible

to the federal government.[1] According to the legislative history of § 1701z–11:

> The goals of the program include disposition of projects in a cost-effective manner in accordance with the objectives of preserving this housing for low- and moderate-income families, preserving residential neighborhoods, maintaining housing in decent condition, minimizing displacement of tenants, and approving demolition of projects only as a last resort.

S.Rep. No. 871, 95th Cong., 2d Sess. 23, *reprinted in* 1978 U.S. Code Cong. & Ad. News 4773, 4796; *see also* H.Rep. No. 1792, 95th Cong., 2d Sess. 67–68; *reprinted in* 1978 U.S. Code Cong. & Ad. News 4872, 4887–88. We conclude that HUD's sale of Stonekey II without rental subsidies was not arbitrary or capricious under this statute, because it was rational and based solely on relevant factors.

■ HUD's sale of Stonekey II without rental subsidies was rational. HUD points out that Stonekey II had not been sustainable as a housing project for approximately twenty years. Vacancies began in the early 1960's, and accelerated as the physical plant deteriorated due to, among other things, poor maintenance, poor management, low-quality rehabilitation work, and marketing problems. During the period that Flanner House owned the project, the number of units subject to rental subsidy contracts increased from fifty to 100 units; yet as of May, 1973, only forty units were actually rented. Even after rehabilitation, Flanner House never achieved more than one-third occupancy in the building. In October, 1977, the occupancy rate for Sto-

nekey II was between 25% and 30%, and the property had a negative value of $1,424,008.00. By November, 1977, part of Stonekey II was completely vacant and boarded up. The HUD area office concluded that, based on this history of the project and the cost of renovating the buildings, which it determined to be "excessive," the project should be sold without subsidies. The record in this case establishes "a rational connection between the facts found and the choice made," *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

The agency also based its decision solely on relevant factors. Appellants argue that HUD looked only to cost, and that cost is an impermissible factor. It is true that Congress established the property disposition program "at least partly in response to the earlier HUD policy of disposing of properties with a view only toward realizing maximum financial return and without consideration of the impact of such sales on the tenants in residence, the character and prospects for the neighborhood, or national housing goals," *Frisby,* 755 F.2d at 1062 (Becker, J., dissenting). However, the 1978 amendments to the Housing Act of 1934 did not eliminate cost as a factor in HUD's decision-making process. *See* 12 U.S.C. § 1701z–11(a) (1982). Because cost remains a relevant factor in the statute, HUD did not violate the statute merely by considering cost.

Moreover, the property disposition statute does not preclude HUD from finding, in certain cases, that the cost factor outweighs the other goals expressed in the statute. "[[A]lthough the Secretary is re-

---

1. Under the property disposition statute, HUD may:

   dispose of projects in a manner which will protect the financial interests of the Federal Government and be less costly to the Federal Government than other reasonable alternatives by which the Secretary can further the goals of—

   (1) preserving the housing units so that at least those units which are occupied by low- and moderate-income persons or which are vacant, at the time of acquisition, are available to and affordable by such persons;

   (2) preserving and revitalizing residential neighborhoods;

   (3) maintaining the existing housing stock in a decent, safe, and sanitary condition;

   (4) minimizing the involuntary displacement of tenants;

   (5) minimizing the need to demolish projects; and

   (6) maintaining the project for the purpose of providing rental or cooperative housing.

   The Secretary, in determining the manner by which a project shall be managed or disposed of, may balance competing goals relating to individual projects in a manner which will further the achievement of the overall purpose of this section.

   12 U.S.C. § 1701z–11(a) (1982).

quired to consider all the objectives set forth in the statute, there is, of course, no requirement that the specific course of action taken by the Secretary in fact further all of those objectives." *Frisby*, 755 F.2d at 1057. A finding that a particular project cannot effectively be maintained does not necessarily violate the property disposition statute. Administrative agencies have limited resources, and in order to most efficiently further the policy goals of the property disposition statute, HUD must occasionally drop an individual project that clearly cannot be made cost-effective. *See id.* at 1056. Although the six policy goals enumerated in the amended property disposition statute clearly are to take precedence over considerations of cost, the statute does not require HUD to pursue the policy goals regardless of expense.

### B.

Appellants' second argument is that the Secretary's action in selling Stonekey II without rental subsidies was arbitrary and capricious because it violated HUD's own regulations, which have the force of law, *see United States v. Nixon*, 418 U.S. 683, 695, 94 S.Ct. 3090, 3100, 41 L.Ed.2d 1039 (1974). However, we find no violation in this case.

### 1.

Under 24 C.F.R. § 290.25(b), a formerly subsidized project, such as Stonekey II, may not be sold without a subsidy if there is a need for low and moderate income housing in the community.[2] The regulation further states that need exists unless HUD finds that "(1) [t]here is sufficient decent, safe and sanitary housing available in the market area at rents the present eligible tenants can afford without

exceeding 25 percent of income, and (2) such housing is not needed for other persons residing in or expected to reside in the community." 24 C.F.R. § 290.25(a) (1986). HUD sold Stonekey II without a rental subsidy based on the finding that there was no need for two-bedroom, low-income housing in the neighborhood of Stonekey II. Appellants challenge this finding as unsupported by the record, and therefore arbitrary.

The appellants first dispute HUD's statistics. HUD's disposition analysis concluded that there was no need for two-bedroom, low-income housing in the neighborhood of Stonekey II based in part on a finding that the immediate area was "saturated" with two-bedroom units. According to HUD's findings, 82% of the units in the immediate vicinity were two-bedroom units. Appellants argue, however, that the correct figure was at most 68%, not 80%. Appellants also point out that the Indianapolis Public Housing Authority's longest waiting list was for two-bedroom units. Because the demand for two-bedroom units in Indianapolis as a whole was between 50% and 55% of the total demand for subsidized housing, appellants infer that the need in the vicinity of Stonekey II was the same. Finally, appellants argue that an estimate of the supply of two-bedroom units is meaningless without an estimate of the demand in the area, and argue that the numbers HUD relied on were outdated because they were based on data gathered in 1974, when HUD first acquired Stonekey II.

Although the evidence of need is somewhat contradictory, we conclude that HUD's finding is not arbitrary. To prove that the agency's action was arbitrary or capricious, the appellants must show that, based on "concrete evidence, readily avail-

---

2. 24 C.F.R. § 290.25 reads:

**Determination of need for low and moderate income housing.**

(a) There is a need for low and moderate income housing in the market area served by the project which is under review unless the Director finds: (1) There is sufficient decent, safe and sanitary housing available in the market area at rents the present eligible tenants can afford without exceeding 25 percent of income, and (2) such housing is not needed for other persons residing in or expected to reside in the community.

(b) Formerly subsidized projects and formerly unsubsidized projects serving as a lower income housing resource, as determined pursuant to § 290.27(c), may not be sold without a subsidy if there is a need for low and moderate income housing in the community.
24 C.F.R. § 290.25 (1986).

able to HUD during its decision-making process," *Alschuler v. Dep't of Housing & Urban Development*, 686 F.2d 472, 485 (7th Cir.1982), the agency clearly relied on outdated or inaccurate data. Here, the appellants have shown only that different methods of calculating need would have produced different results. Moreover, in this case HUD relied not only on statistics to calculate need, but on the opinions of its housing analysts, on whose expertise the agency was entitled to rely. On balance, HUD's finding that there was no need in the immediate area for two-bedroom units is supported by the record.

The appellants also argue that the relevant "community" was the entire city of Indianapolis, rather than the few blocks around Stonekey II. Although 24 C.F.R. § 290.25 does not define the term "community," § 290.25(a) speaks of the "market area" served by the project at issue. Appellants point out that HUD, in one of its reports, itself identified the relevant market area in this case as the city of Indianapolis. Thus, they argue, the need for low-income, two-bedroom units in the immediate vicinity of Stonekey II was irrelevant; the pertinent area was the entire city.

However, in addition to finding that the immediate neighborhood of Stonekey II was saturated with two-bedroom units, HUD concluded in its property disposition analysis that the need in the city as a whole was insufficient to require that Stonekey II be sold with a rental subsidy. Again, the appellants challenge HUD's figures, but in the absence of a showing that HUD's data were clearly false, we must decline to set aside the agency's action.

We will " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual*, 463 U.S. at 43, 103 S.Ct. at 2867 (*quoting Bowman Transportation v. Arkansas-Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). In this case, although HUD's analysis could certainly have been clearer, we cannot conclude that its findings regarding need were arbitrary and capricious.

Even if HUD was justified in finding that there was no need for two-bedroom housing in the vicinity of Stonekey II, HUD was nevertheless required under 24 C.F.R. § 290.27 to sell Stonekey II with subsidies, because the property was a "formerly subsidized project" within the meaning of that regulation. *See* 24 C.F.R. § 290.27(a) & (b) (1986). In this case, however, HUD waived this regulation pursuant to 24 C.F.R. § 290.7, which provides that "[u]pon completion of a determination and finding of good cause by the Assistant Secretary for Housing-Federal Housing Commissioner or his or her designee, HUD may waive any provision of this part in any particular case subject only to statutory limitations." 24 C.F.R. § 290.7 (1986). The reasons given for HUD's waiver of 24 C.F.R. § 290.27 were: (1) there was a sufficient number of available subsidized units at Stonekey I for the displaced Stonekey II tenants; (2) rehabilitation costs were excessive; (3) the cost of conversion to larger units was excessive; and (4) HUD would provide displacement assistance. The appellants attack HUD's finding that conversion costs were excessive.

If the cost of rehabilitation or conversion exceeds 85% of the estimated cost of replacement, HUD considers the proposed work not financially feasible. *See* 24 C.F.R. § 290.43(a)(2) (1986). Under HUD's proposed conversion option for Stonekey II, the cost of conversion was slightly over 85%. The appellants point out, however, that HUD rejected the less expensive recommendations in its architect and engineer's report to pursue this far more costly option.

HUD's choice was not arbitrary or capricious. The record shows that HUD's housing analysts had consistently identified tenants' preferences for more attractive, modern housing as a factor contributing to Stonekey II's failure. HUD's preferred option emphasized aesthetic values, such as gabled roofs to replace the flat roofs with which the project was built. Therefore, on this record, the agency's choice was permissible. Because there was "good cause"

for the waiver, HUD's sale of Stonekey II was not arbitrary or capricious.

## IV.

We conclude that HUD's sale of Stonekey II to a private party without rental subsidies was neither arbitrary nor capricious. The appellants may well be correct when they attribute a large measure of the responsibility for Stonekey II's failure to HUD, but the history of this project is not before us. Because the record supports HUD's ultimate decision to abandon the project, the judgment of the district court is affirmed.